IN THE MATTER OF LENDALL B. TERRY, JUDGE OF THE RIPLEY CIRCUIT COURT, 80TH JUDICIAL CIRCUIT.

[No. 374S68. Filed February 20, 1975.
Rehearing denied June 10, 1075.]

*John C. Ruckelhaus, Arch N. Bobbitt,* of Indianapolis, for respondent.

*Richard H. Grabham,* Executive Secretary, *Mark W. Gray,* Assistant Counsel, for Indiana Supreme Court Disciplinary Commission.

HUNTER, J.—This is a disciplinary proceeding initiated by the Disciplinary Commission against respondent Lendall B. Terry in his capacity as a judicial officer and as a member of the bar. The verified complaint of the Disciplinary Commission alleged that certain conduct of the respondent violated the Code of Judicial Conduct and Ethics, the Code of Professional Responsibility, the Oath of Attorneys (Admission and Discipline Rule 22), and the Judicial Oath for Ripley County Circuit Court. A hearing officer was appointed to hear evidence in this matter.[1]

---

1. The hearing officer found certain political activity engaged in by respondent did not violate Rule 17 of the Code of Judicial Conduct and Ethics. Neither the Disciplinary Commission, nor the respondent, objects to this finding, and we do not consider it here.

Respondent requested a public hearing which was conducted over a period of four and one-half days. After hearing and observing the witnesses presented by the Disciplinary Commission and by the respondent, the hearing officer filed his Findings of Fact and Conclusions. These Findings and Conclusions were generally adverse to the respondent. Respondent then filed his Petition for Review of Hearing Officer's Findings and Conclusions.

Respondent's petition, upon which this Court heard oral argument, frames three issues for review:

    I. Whether the Supreme Court of Indiana is without jurisdiction to discipline respondent in his capacity as a circuit judge, except as provided by Article 7, section 13 of the Indiana Constitution.

    II. Whether the Disciplinary Commission is without authority to bring a disciplinary action against a circuit judge.

    III. Whether there is sufficient evidence to support the findings of the hearing officer.

## I.

Respondent's jurisdictional attack is based upon the misconception that this is an action for removal (impeachment) pursuant to section 13 of Article 7 of the Indiana Constitution, rather than an action for *discipline* pursuant to section 4 of the same Article. Since we have recently written at length upon the relationship of these sections to the disciplining of all judges, including those of the circuit court, it is sufficient to note that the findings of the hearing officer in this matter correctly identify the jurisdictional base as section 4 of Article 7. For the reasons stated in *In Re Evrard* (1974), Ind., 317 N.E.2d 841, this matter is properly before this Court.

## II.

An analysis of respondent's contention that the Disciplinary Commission lacked authority to maintain this action begins

with the constitutional cornerstone of Article 7, section 4. Section 4 invests this Court with original jurisdiction in matters of ". . . *discipline*, removal and retirement of justices and judges. . . ." (Emphasis added.) In the exercise of this jurisdiction, respondent does not suggest any constitutional, statutory, or other legal basis which prohibits this Court from placing upon the Disciplinary Commission the task of investigating and prosecuting disciplinary actions involving judicial officers. Indeed, the interest of the public in the efficient resolution of disciplinary matters, as well as requirements of fundamental fairness for the respondent, suggest the propriety of delegating those functions to an independent body.

### III.

On review of the evidence presented, we conclude that the findings of the hearing officer are supported by sufficient evidence.[2] While those findings relate to respondent's conduct as a judicial officer and as a member of the bar, we review the evidence herein only as it sustains

---

2. The standard of review applied in this matter is the same as the one applied in review of disciplinary proceedings against attorneys. The standard is set forth in Admission and Discipline Rule 23, section 15(c) which provides:

"In the event that this Court grants a petition under this Section 15, briefs may be filed and oral arguments heard, as the Court shall determine. Such briefs need not conform to the rules of this Court. *Upon review the Court shall determine whether the findings and recommendations of the hearing officer or officers are supported by sufficient evidence and shall enter its judgment, with or without opinion as the Court shall determine.*" (Emphasis added.)

In reviewing the evidence before us, we are mindful of the serious nature of disciplinary actions, particularly those involving members of the judiciary. However, upon reviewing all pleadings and memoranda filed in support thereof, a transcript of one thousand pages and numerous exhibits, we conclude that sufficient evidence has been presented to support the findings and conclusions of the hearing officer.

The dissenting opinion urges that the gravity of this case requires that we conduct further inquiry into this matter by means of a trial *de novo*. We believe that the ends of justice, in this particular matter, would not be aided by resort to such procedure. Respondent has not asserted any infringement of his due process rights arising from the procedure employed herein. Nor has respondent sought a trial *de novo*. Indeed, respondent explicity recognized the standard herein applied in his Petition

the hearing officer's conclusion that respondent violated Rules 1, 2, 3, 8 and 10 of the Code of Judicial Conduct and Ethics.[3]

Before reviewing the evidence, it is helpful to briefly sketch the development of the rules which govern the conduct of the judiciary. Rules of judicial conduct inhere in the unique role which society assigns to the judicial officer. That role requires unblemished behavior both on and off the bench. As stated by Chief Judge John S. Hastings, United States Court of Appeals for the Seventh Circuit:

"The assumption of office by a judge casts upon him a standard of personal conduct higher than that charged to

---

for Review of Hearing Officer's Findings and Conclusions. Paragraph three of respondent's petition stated:

"The Hearing Officer did not find that his Findings and Conclusions were supported and proven by a preponderance of the evidence as required by Admission and Discipline Rule 23, Sec. 14(d), as amended effective March 14, 1973."

Section 14(d) provides:

"Within thirty (30) days after the conclusion of the hearing, the hearing officer *shall determine whether misconduct has been proven by preponderance of the evidence* and shall submit to the Supreme Court written findings of fact deduced by him from the evidence. The hearing officer may submit recommendations concerning the disposition of the case with his findings of fact, but such recommendations shall be given only such weight by the court as it believes to be consistent with a paramount consideration of uniformity of discipline throughout the state. A copy of said findings and recommendations, if any, shall be served by the hearing officer on the respondent and the executive secretary of the Disciplinary Commission, at the time of filing the same with the Supreme Court. This rule shall be effective on or after its adoption." (Emphasis added.)

Under these circumstances a trial *de novo* is not warranted.

3. In view of the disposition of this matter, we believe that the public interest does not *at this time* require further disciplinary action against respondent as a member of the bar, although the hearing officer found violations of Disciplinary Rules 1-102(A)(4), (5) and (6) of the Code of Professional Responsibility. We expressly reject respondent's contention that he is subject neither to the Code of Judicial Conduct and Ethics nor the Code of Professioal Responsibility. *He is subject to both.* As the Standing Committee on Ethics and Professional Responsibility of the American Bar Association recently stated, ". . . a lawyer must comply at all times with all applicable disciplinary rules of the Code of Professional Responsibility whether or not he is acting in his professional capacity. * * * The provisions of DR 1-102(A)(3) and (4) are not limited to a lawyer's conduct while he is acting in his professional capacity as a lawyer. They are applicable to all conduct of the nature specified in those provisions without regard to the capacity in which the lawyer may be acting." ABA COMM. ON PROFESSIONAL ETHICS, OPINIONS, No. 336 (1974). See also In Re Littell (1973), 260 Ind. 187, 294 N.E. 2d 126.

most of his neighbors. His actions are subject to the criticism of the litigants, their relatives, friends and associates; their lawyers and the bar associations to which they belong; the legislative branches of the government which created certain parts of the judiciary; the communications media; his fellow judges and the general public."[4]

The standards of judicial conduct have not always been formalized in codes such as our Code of Judicial Conduct and Ethics. Nor have formal disciplinary mechanisms, such as the one employed in this proceeding, long existed. Nevertheless, an informal code of judicial responsibility has long governed the actions of the bench. The enforcement of any unwritten code necessarily depends largely upon judicial self-restraint, but the factors mentioned by Chief Judge Hastings would, undoubtedly, come into play at some point to temper the behavior of errant judges.

Judicial ethics have been increasingly formalized during the twentieth century. This formalization is in part attributable to intensified public interest in the efficient and orderly administration of justice. At the same time, the recent expansion of due process rights of an accused has given impetus to formalization. In 1921, the late Benjamin Cardozo, Justice of the United States Supreme Court, implicitly recognized the centrality of such a code to the judicial process. Justice Cardozo stated that a judge "ought . . . in order to escape the dangers of arbitrary action, to disengage himself, so far as possible, of every influence that is personal. . . ." B. Cardozo, *The Nature of the Judicial Process*, 120-21, (1928). In 1924, a committee of the American Bar Association, chaired by William Howard Taft, adopted the first Canons of Judicial Ethics. In November, 1970, the people of this state approved the new Judicial Article to the Indiana Constitution. In so doing the citizens of Indiana squarely placed the responsibility for disciplining judges upon this Court. Pursuant to this

---

4. CONFERENCE ON JUDICIAL ETHICS, Univ. of Chicago Law School, Conf. Ser. 19, at 1, (1965).

mandate, we adopted on March 8, 1971, the Code of Judicial Conduct and Ethics under which respondent is charged.[5]

### Rule 1. Avoidance of Impropriety

Rule 1 provides:

> A judge's official conduct should be free from impropriety and the appearance of impropriety; he should avoid infractions of law; and in his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life, he should strive to be beyond reproach.

In the summer of 1973, respondent visited the residence of a Ripley County Welfare Board member to solicit his vote in an upcoming matter. The board member failed to vote as solicited. Respondent summarily removed the board member, although he made a false entry showing that a hearing had been conducted in the matter.[6] The board member brought an action in mandamus to require the respondent to expunge the removal from the record and to grant a change of venue.[7] The relief prayed for was granted, but respondent failed to comply with this Court's order. Respondent was held in contempt and fined $500.[8] Thereafter, the change of venue was granted and a special judge was appointed to hear the matter. Respondent failed to appear at the removal hearing in his

---

5. The evolution of formal rules of judicial conduct traced in the body of this opinion continues with the recent adoption of the Indiana Code of Judicial Conduct, which became effective January 1, 1975.

6. IC 1971, 12-1-3-2, Ind. Ann. Stat. § 52-1118 provides in pertinent part:

> "All members shall thereafter serve at the pleasure of the respective appointing authority: Provided, That no member shall be removed from such board except for misconduct, incapacity or neglect of duty after due notice in writing and hearing thereon before the appointing authority."

In State ex rel. Sedam v. Ripley Cir. Ct. (1973), 262 Ind. 19, 301 N.E. 2d 185, 187, we held the above language required written notice of specific allegations and a meaningful opportunity to be heard prior to removal.

7. State ex rel. Sedam v. Ripley Cir. Ct. (1973), 262 Ind. 19, 301 N.E. 2d 185.

8. State ex rel. Sedam v. Ripley Cir. Ct. (1973), 262 Ind. 25, 302 N.E. 2d 761.

own court, and the action was dismissed for want of prosecution. Respondent's unexplained failure to appear at the hearing leads to but one conclusion: respondent knew of no legal basis for removal of the board member.

The dissent herein finds this conclusion unwarranted, since the record does not affirmatively demonstrate that respondent received notice of the hearing. We hasten to add that the record contains no denial by respondent that he received notice. Moreover, we do not view the lack of formal notice, in this instance, as fatal. Undoubtedly, a special judge must consult either the regular judge or his clerk prior to setting any hearing in the regular judge's court. Ordinarily, judicial courtesy will result in the necessary arrangements being made between the special judge and the regular judge. Even assuming the instant arrangements were made only through the clerk of respondent's court, we are not hesitant in charging respondent with knowledge of his dockets, particularly in a matter of such great importance to him.

Respondent sought retribution against the attorney (Johnson) who had successfully represented the welfare board member in the removal action. Respondent attempted to persuade the prosecutor to bring perjury charges against Johnson because of a sworn statement in Johnson's "Petition for Contempt Proceedings" against respondent. The statement averred that the attorney for the welfare board was also "attorney of record for respondent in this cause [i.e., the removal hearing to be set before the special judge]." Respondent's representation or lack thereof in the removal proceeding is not probative of the sole issue of the contempt proceeding: i.e., whether respondent had complied with the earlier orders of this Court. Moreover, the evidence indicates that Johnson's allegation was based upon his good faith belief that the attorney was in fact representing respondent. Without evidence that Johnson's statement was made with the requisite intent and that it was

material to his petition for contempt proceeding, the retributive nature of respondent's actions becomes apparent.[9]

In an estate matter respondent properly sought to determine the validity of the executrix's signature on a petition for allowance of attorney's fees. Respondent contacted the prosecutor, informed him of his belief that a forgery had been committed, and requested that criminal charges be filed against the estate's attorney. The prosecutor submitted the petition containing the alleged forgery, together with other handwriting specimens of the executrix, to the State Police for expert analysis. When the report indicated that the signature appeared genuine, the prosecutor informed respondent of his intention not to prosecute. Respondent, however, was not satisfied. He held an *ex parte* inquisition of the executrix, after placing her under oath and reading her the perjury statute. Respondent then called a grand jury to investigate the matter, but the grand jury failed to return an indictment. Respondent made public his charge against the attorney for the estate. Respondent also publicly charged the prosecutor with misconduct in failing to file an affidavit or to secure an indictment. Respondent's public comments on the refusal of the grand jury to indict insinuated that the grand jury did not have all the information before it for deliberation. When the grand jury reconvened, respondent was summoned, but he failed to appear, and the grand jury again refused to return an indictment. Respondent introduced no evidence at the hearing that he had been professionally trained in the science of handwriting analysis or even that he was familiar with the handwriting of the executrix.

9.  IC 1971, 35-1-90-1, Ind. Ann. Stat. § 10-3801 provides:

"Whoever, having taken a lawful oath or affirmation in any matter in which, by law, an oath or affirmation may be required, shall, upon such oath or affirmation, swear or affirm wilfully, corruptly and falsely touching a matter material to the point in question, shall be deemed guilty of perjury, and, on conviction, shall be imprisoned in the state prison for not less than one [1] nor more than ten [10] years."

In a divorce proceeding, respondent refused to accept a property settlement upon which the parties agreed, because it did not provide for child support payments. The wife testified that her attorney had advised her to request support, but she rejected such advice because of her own belief that if the husband did not pay support, he would not come to visit the children. In spite of this testimony, respondent stated that such an agreement was a fraud upon the court and accused her attorney of failing to adequately represent his client.

Respondent threatened to hold an attorney in direct contempt for filing a verified petition for continuance and for a change of judge. On another occasion respondent examined a jail matron about her alleged refusal to obey the judge's order on visiting hours. Undoubtedly, this action was proper. However, during this examination respondent stated that he was not convinced that direct contempt had taken place, but that in the slow progress of an appeal, the sentence, if imposed, would be served before the determination of the appeal. This statement indicates an irresponsible and non-judicial attitude toward the exercise of the contempt powers.

After members of the Ripley County bar initiated a request for investigation of respondent by the Disciplinary Commission, respondent and his agents began a massive publicity campaign to abort the disciplinary proceedings. Petitions were prepared in support of respondent. On February 23, 1974, respondent, in response to a question from the pulpit during a worship service, stated that he had extra petitions in his car for anyone wishing to distribute them. Respondent knew, or should have known, that requests for disciplinary action are not terminated at the outset by publicity campaigns. Disciplinary proceedings will be terminated after initial investigation only if no substantial question of misconduct exists. *Admission and Discipline Rule 23.* One result of respondent's misguided attempt to circumvent the law was the further denial of equal justice to the citizens of Ripley County. Because of respondent's

publicity campaign, opinion became polarized in Ripley County, so as to make the selection of a fair and impartial jury virtually impossible. Thus, citizens of Ripley County, who were clients of attorneys who had signed the disciplinary petition, were chilled in the exercise of their right to trial by jury. As one attorney-signer stated, ". . . unless I have the list of the 1,200 or 1,300 people who signed . . . I'm not going to take that chance."

From the foregoing evidence it is apparent that respondent's official conduct has not been free from impropriety. Nor has respondent sought to avoid the appearance of impropriety. Specifically, we find the following conduct of respondent improper under Rule 1:

(1) Soliciting the vote of the welfare board member.

(2) Removal of the board member in an unlawful manner.

(3) Making false entries of record.

(4) Failure to appear at the lawful hearing for removal of the board member.

(5) Attempting to cause false criminal charges to be filed against the welfare board member's attorney in pursuit of respondent's personal vendetta.

(6) Public harassment of a prosecutor who refused to violate his oath by filing criminal charges where no probable cause existed.

(7) Failure to appear before the grand jury after leading the public to believe that he possessed information that a crime had been committed.

(8) Charging an attorney with failing to adequately represent his client, in the client's presence, merely because respondent did not agree with the desired settlement.

(9) Threatened abuse of contempt powers in response to an attorney's motion for continuance and change of judge.

(10) Participating in a public campaign to circumvent disciplinary action.

### Rule 2. Court Organization

Rule 2 provides:

A judge should organize the court with a view to the prompt and convenient dispatch of its business and he should not

tolerate abuses and neglect by clerks, and other assistants who are sometimes prone to presume too much upon his good natured acquiescence by reason of friendly association with him.

It is desirable, where the judicial system permits, that he should cooperate with other judges of the same court, and in other courts, as members of a single judicial system, to promote the more satisfactory administration of justice.

Rule 2 requires that a judge "organize the court with a view to the prompt and convenient dispatch of its business." The evidence indicates that respondent deliberately organized his court in a manner designed to delay the business of Ripley County attorneys who had signed the disciplinary grievance.

Viewed in the context of the actual delays encountered, we cannot say that all similar delays constitute a violation of Rule 2. But where the evidence is clear that the delay interposed is attributable to the retaliatory motives of the respondent, any delay is excessive. Here, respondent presented the testimony of non-Ripley County attorneys who were uniform in praising the fair and expeditious treatment they received in respondent's court. Respondent's differential response to court business is a clear violation of Rule 2. Respondent's conduct in this matter is also a violation of Rule 1 and Rule 10.

We note that respondent's attempt to punish Ripley County attorneys, in at least one instance, had far-reaching effects. On February 28, 1974, a client appeared at the office of a Ripley County attorney. The client stated that she had just been released from the hospital after recuperating from a beating administered by her husband. The attorney prepared a petition for dissolution of the marriage and for an emergency restraining order. Respondent granted the emergency order that same day. On March 6, the client returned stating that she had again been beaten by her husband, after being picked up and driven about at gun point. Furthermore, the husband had threatened to kill her and the children. The attorney contacted the prosecutor and a warrant was issued for the

husband's arrest on the charge of carrying an unlicensed pistol. Thereafter, the husband was arrested and subsequently released on bond. On the day of his release, he again violated the restraining order and renewed his threats to kill his wife and children. On March 27, the attorney prepared a petition for contempt against the husband. Respondent issued an order to show cause on March 29 and set hearing for April 8. On that date, the attorney and his client arrived at the courthouse only to be advised for the first time that the hearing had been continued. On April 9, the attorney prepared new orders and took them to the courthouse. On April 24, the wife was again accosted. On April 26, the attorney asked respondent either to enforce the restraining order or grant a change of judge motion which had been pending since March 21. A few hours after respondent granted the latter motion, the attorney received notice that his client had been stabbed by her husband.

We find that respondent has violated Rule 2 by organizing his court in manner which denies prompt and convenient dispatch to all litigants, regardless of his personal idiosyncrasies.

### Rule 3. Courtesy

Rule 3 provides:

> A judge should be courteous to counsel, especially to those who are young and inexperienced, and also to all others appearing or concerned in the administration of justice in the court.

Respondent was duly admitted to the bar of this Court in 1952. He ascended the bench of the Ripley Circuit Court on January 1, 1973. Respondent's relations with the bar of Ripley County were initially courteous and looked toward efficient administration of justice in the Ripley Circuit Court. Similarly, the record demonstrates the courtesy of the bar toward the new judge. Testimony was presented that many of the members of the bar initially observed a self-imposed moratorium on setting causes for trial. The purpose of the

moratorium was to lighten the burden upon the judge as he disposed of pending matters and became acclimated to his new position. Slowly, the wheels of justice began to turn in Ripley County.

After his unsuccessful attempt to unseat the welfare board member, respondent's relationship with the Ripley County bar began to change. Business which had previously been conducted expeditiously was conducted only after delay and petty questioning of counsel. Respondent's conduct on the bench became more oppressive when the disciplinary complaint was filed. An attorney called as an expert witness to testify on the value of services submitted in an estate matter summarized his questioning by respondent:

"I have never seen any lawyer hung out like I was on that cross-examination in open court before the public, or like Mr. Kellerman on his cross-examination."

Another member of the Ripley County bar testified:

"After the filing of the request for investigation early in February, I think on every occasion when I was in the court, probably five, six or seven times after that, either in chambers or in open court, Judge Terry would make comments to me to whomever was present in the courtroom concerning the matter, questioning the motives of the attorneys who filed, indicating that it was an attempt to; I don't know, he referred to cover up."

The record indicates that on several occasions respondent sought to demean counsel in open court in the presence of their clients by charging them with inadequate representation of their clients. Such charges, if unfounded, tend to undermine the attorney-client relationship. To discourage the making of such charges lightly or for personal ends, the Code of Professional Responsibility, which is applicable to respondent, requires one possessing unprivileged knowledge of any conduct adversely reflecting upon the fitness of counsel to practice law, to present such information to the proper investigative body. DR 1-103(A). Hence, it was respondent's duty, if he believed such charges to be well

founded, to bring them to the attention of the Disciplinary Commission. Respondent's failure to bring such charges indicated that his conduct was malicious and discourteous, in violation of Rule 3.

The evidence demonstrates that respondent has also transgressed Rule 3 insofar as it relates to non-attorneys. Respondent's behavior in the jail matron contempt matter, (see Rule 1, *supra*), was not in accord with Rule 3. Likewise, respondent's questioning in a divorce proceeding of the husband's mental competence and the motives of his employer re certain of the husband's parents was improper and discourteous.

We find that respondent has violated Rule 3 in his treatment of attorneys and clients appearing before the court.

### Rule 8. Intervention in Conduct of Trial

Rule 8 provides:

> A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses may tend to prevent the proper presentation of the cause or the ascertainment of the truth in respect thereto.
>
> He should avoid *interruptions of counsel in their arguments* except to clarify his mind as to their positions or to prevent improper argument or conduct of counsel. He should not be tempted to the unnecessary display of learning or a premature judgment. (Emphasis added.)

In a paternity action, in open court and with witnesses present, respondent questioned an attorney at length concerning his participation and motives in filing a petition for investigation of respondent by the Disciplinary Commission. Such conduct was grossly irrelevant and constituted a violation of Rule 8.

Respondent's questioning of the husband in the divorce proceeding, (see Rule 3, *supra*), was also violative of Rule 8.

In an estate matter, on petition for allowance of fees, respondent quizzed the attorneys in open court about their involvement in the disciplinary proceedings against respondent.

The record shows that respondent on several occasions held lengthy in camera inquisitions of attorneys appearing on official business, prior to, during, or after the conduct of such business. As one attorney stated:

> "When I go to the Judge's office, I have to undergo an interrogation type process where he attempts to elicit the facts of this case, which I am sworn by the Disciplinary rules not to disclose, and I keep telling him I am not supposed to disclose them."

The latter conduct of respondent, while deplorable, did not violate Rule 8, since it did not occur at trial. However, such conduct, under the circumstances of this case, violated Rules 1 and 10.

We find that respondent's questioning of witnesses and attorneys exceeded the narrow limits of judicial propriety[10] in violation of Rule 8.

### Rule 10. Idiosyncrasies

Rule 10 provides:

> A judge should adopt the usual and expected method of doing justice and not seek to be extreme or peculiar in his judgments or spectacular or sensational in the conduct of the court. In imposing sentence, he should endeavor to con-

---

10. Compare the ABA STANDARDS RELATING TO THE FUNCTION OF THE TRIAL JUDGE, approved Draft (1972), Standard 6.4, which provides:

"The trial judge be the exemplar of dignity and impartiality. He should exercise restraint over his conduct and utterances. He should suppress his personal predilections, and control his temper and emotions. He should not permit any person in the courtroom to embroil him in conflict, and he should otherwise avoid conduct on his part which tends to demean the proceedings or to undermine his authority in the courtroom. When it becomes necessary during the trial for him to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, he should do so in a firm, dignified and restrained manner, avoiding repartee, limiting his comments and rulings to what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues."

form to a reasonable standard of punishment and should not seek popularity or publicity either by exceptional severity or undue leniency. Justice should not be moulded by the individual idiosyncrasies of those who administer it.

The evidence set forth above reveals that respondent has been guided in the administration of justice by personal idiosyncrasies. To paraphrase a statement from *In Re Littell* (1973), 260 Ind. 187, 294 N.E.2d 126, respondent has too often permitted the man that he is to overpower the judge that he undertook to be.

Respondent has often approached the problems before him with a predetermined judgment in mind. We have considered in this regard:

Respondent's illegal and extralegal attempts to remove a welfare board member;

Respondent's attempt to publicly disparage a prosecutor who failed to file charges when no probable cause existed;

Respondent's attempts to discredit the finding of a grand jury and his failure to appear before that body to present any evidence of the commission of a crime; and

Respondent's attempts to retaliate against those attorneys who initiated this proceeding by charging them with wrongdoing in the presence of their clients, while failing to bring any charges of misconduct to the attention of the Disciplinary Commission.

From the record, it is evident that respondent has allowed his personal motives to govern his questioning of witnesses and attorneys. Such motives led respondent far from the path of justice.

Respondent's idiosyncrasies are further demonstrated by his ill-conceived notions of the court's contempt powers as discussed above.

We find that respondent has violated Rule 10.

### IV.

It is with reluctance that we accept the grave constitutional responsibility of disciplining a fellow judge; however, duty demands it. From the record we must conclude there is a breakdown in the impartial administration of justice in the

Ripley Circuit Court. The evidence affirmatively demonstrates respondent's lack of judicial temperament and his unfitness to occupy judicial office.

We therefore find that the responent shall be suspended without pay from the office of the Judge of the Ripley Circuit Court.[11] We further find that a Judge Pro Tempore should be appointed in his stead to carry out all duties incumbent upon the Judge of the Ripley Circuit Court.

It is hereby ordered that the respondent be suspended instanter without pay until the further order of this Court.

This Court appoints The Honorable Joseph L. Hensley of Madison, Indiana, to serve as Judge Pro Tempore of the Ripley Circuit Court, and he shall be paid on the same salary basis as Judge of the Ripley Circuit Court as provided by statute.

It is further ordered by this Court that the respondent shall in no way, directly or indirectly, interfere with the assumption of duties of the Ripley Circuit Court by The Honorable Joseph L. Hensley.

We hereby affirm the findings and conclusions of the hearing officer as modified herein.

Givan, C.J., Arterburn, J., concur; DeBruler, J., concurs in Parts I and II of the Majority Opinion and dissents to Part III with opinion and votes to enter judgment for respondent. In light of the judgment of the majority, DeBruler J., concurs in the selection of Joseph L. Hensley as Judge Pro Tempore; Prentice, J., concurs in part and dissents in part, with opinion.

### Concurring and Dissenting Opinion

DeBuler, J.—I concur in Sections I and II of the Court's opinion, but dissent to Section III in its entirety. The area of disagreement may be categorized as follows:

---

11. "Our disciplinary power . . . includes suspension . . . without pay, . . . ." In Re Evrard (1974), Ind., 317 N.E. 2d 841.

I. The proper function of this Court in reviewing the findings and conclusion of our hearing officer.

II. The legal role which is played by the Rules of this Court which governed judicial conduct at all times relevant to this case.

III. The inferences which may legitimately be drawn from the evidence produced by the Disciplinary Commission at the hearing.

## I.

Article 7, § 4, provides this Court with original jurisdiction to discipline, remove and retire justices and judges. It is intended here that this Court make the decision in these matters. While I have no quarrel whatever with the appointment of hearing officers by this Court to conduct the plenary hearings of judge and lawyer disciplinary cases, this must be done as part of a procedure which maximizes the scope of this Court's function in making its ultimate decision. Words here may fail. The degree to which we should feel bound by "factual" determinations by our hearing officers should be at its lowest ebb in these types of cases. This is not to diminish the value of the findings of our hearing officers to our decisional processes, as that value is very great. These findings serve to channel this Court's decisional processes. The findings are the product of the application of the rules of evidence. They properly serve to settle what the physical facts were and fix them in time and place. But, in a case such as this, I do not believe we can, consistent with our duty to function in an "original" plane, limit ourselves to finding evidence in support of the hearing officer's determination. For example, the hearing officer concluded, among other things, Judge Terry delayed in processing the matters of local attorneys as part of a plan to cause them discomfiture in retaliation for their having filed a claim of misconduct against him, and he also determined that the Judge's public statements inflamed the passions of Ripley County and thereby impermissibly impeded the investigation by the Commission into this claim of misconduct. Conclusions such as these are the

product of a collation of much evidence and involve questions of state of mind and of degrees of compliance with flexible rules being applied in varying circumstances. The knowledge which justices of this Court have of the operation of the trial courts throughout the State uniquely equips them to make fresh and separate determinations of such matters. In a case such as this, where the claim is made that the evidence does not support the findings of the hearing officer, the Court's aperture should be opened wide. I would in effect provide a trial *de novo* before this Court on the record and freely permit the taking of additional evidence where a just decision would be further insured thereby. I hasten to point out that the Court's opinion does not reject this approach. The opinion reveals that the evidence was extensively examined.

## II.

Rules 1, 3 and 10 adopted by this Court on March 8, 1971, were not adopted for the purpose of setting legal standards for judicial conduct, the violation of which could subject a judge to disciplinary action. They are simply too vague to serve this purpose. No judge could possibly know what conduct on his part might be deemed to be "improprietous", "discourteous", or "ideosyncratic". This State does have a legitimate interest in governing the conduct of judges in their official duties and in matters which directly affect the conduct of their official duties. But in furthering this interest by law, we must set reasonably specific standards and afford those charged with violating those standards a fair procedure. It is the first duty of courts to construct a "formulated basis in reason" for "justifying and guiding emotion and instinct". *Sherman* v. *U.S.* (1958), 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848.

The Code of Judicial Conduct and Ethics effective March 8, 1971, which existed at the time of the allegedly unethical conduct of Judge Terry did not purport to set specific legal standards, but was a statement of an ideal to which we were

exhorting the judges of the State. It was TR. 63, with its standards and mechanism, the common law, the political system which produces most trial judges in our State, which served to protect the legitimate interests of the State in the maintenance of efficient and impartial tribunals. In my opinion, we cannot, consistently with the Due Process Clause of the Fourteenth Amendment, elevate these Rules of Conduct to the level of law.

## III.

The hearing officer made the following finding:

"2. That on the 31st day of October, 1973, Respondent was found guilty of contempt of the Supreme Court of Indiana for willful disobedience of said court's order; that Respondent attempted to induce the Prosecuting Attorney of Ripley County to file charges of perjury against attorney Philip Johnson because said attorney had represented T. Melvin Sedam and other members of the Ripley County Welfare Board in proceedings against Respondent for mandate and contempt before the Supreme Court of Indiana; that Respondent caused a petition to be filed before him for the removal from office of Mr. Sedam, a member of the Ripley County Welfare Board, conducted said hearing and entered an order removing said Mr. Sedam; and that after said order was vacated and a change of venue granted by order of the Supreme Court of Indiana through an original action, Respondent failed to appear or present any evidence before the Honorable Lester Baker, Special Judge, on the day set for trial and said action was dismissed for want of prosecution;"

It is true and undisputed on the record that the respondent was found guilty of contempt by this Court in October, 1973. The second part of this finding is not fully drawn. It is undisputed and on the record that the judge brought this matter to the prosecutor's attention because of a false substantive allegation which Philip Johnson made in his affidavit for contempt proceedings against the judge before this Court. That affidavit contained the following factual allegation:

"7. That on September 17, 1973, at a regular meeting of the Ripley County Board of Public Welfare, board members heretofore appointed by Judge Lendall B. Terry, in-

cluding Fred E. Auel, the successor to J. Melvin Sedam, failed and refused to recognize Sedam and upon advice of their counsel, *Terrance W. Richmond, who is also the attorney of record for the respondent in this cause,* elected to continue that refusal until such time as special judge, The Honorable Lester G. Baker, took further action in the cause. Thereafter, the two remaining board members departed said meeting in protest of the refusal to seat and recognize Sedam on the board." (Emphasis added.)

The testimony of Judge Baker and Terrance Richmond at the disciplinary hearing would support only one proposition, and that is that Terrance Richmond was not the attorney for the judge in the proceedings. Johnson made his assumption from a telephone call which he had made to Judge Baker, in which Judge Baker told him that he (Judge Baker) had received a telephone call from Terrance W. Richmond in which Mr. Richmond asked whether the case had been set for hearing. At that time, Richmond was known by Mr. Johnson to be the attorney for the Welfare Board. Under these circumstances, I think that the hearing officer's finding that the judge was motivated solely by ill-will toward Johnson is not supported by the evidence.

It is shown by the record that at the hearing to remove the Welfare Board member, which had been initiated by the judge in the first place, the judge did not appear. However, the record absolutely does not include any evidence that the judge received notice of that hearing. Therefore, the judge's failure to appear is not evidence that he initiated the original petition for removal without legitimate grounds.

The hearing officer next made the following finding:

"3. That in December, 1973, Respondent, upon receiving information that a possible forgery had taken place regarding a report filed in his court by attorney William Greeman, properly informed the Prosecuting Attorney of Ripley County of such fact and requested that he investigate the same; that after such investigation the Prosecuting Attorney reported that the evidence pertaining to the alleged forgery was to the contrary and that a conviction could not be obtained; that Respondent thereafter conducted an ex-parte

examination of Rosalie Niles in his courtroom after administering an oath and after reading the perjury statute to said Rosalie Niles and without affording her the benefit of counsel or informing her of her rights; that no action was pending before the court in regard to said Rosalie Niles or the Estate of Ferna Keiffer of which she was Administratrix; and that said examination was in furtherance of Respondent's personal investigation; that Respondent insisted that an affidavit be filed against attorney William Greeman; that when the Prosecutor refused to file the same, a Grand Jury was impaneled to which the matter was submitted; that no indictment was returned by said Grand Jury; that Respondent had personal animosity toward attorney Greeman; that Respondent made his charges public; and that Respondent also made public charges against the Prosecuting Attorney of Ripley County for failure to file an affidavit or obtain an indictment against William Greeman when Respondent had full knowledge that the evidence could not warrant a conviction; that following a second session of the Grand Jury the Respondent prevented the filing of the Grand Jury's report with the Clerk of the Ripley Circuit Court by giving specific instructions that said report not be filed; that Respondent made those charges public solely for the reason that said findings of the Grand Jury and determinations of the Prosecuting Attorney differed from those favored by Respondent; and that Respondent made such charges public in an attempt to bring public pressure to bear so as to induce charges to be wrongfully brought against attorney William Greeman;"

The thrust of this finding is that the circuit judge, being motivated by malice against an attorney and armed with the knowledge that the evidence of the alleged crime would be insufficient to convict, used the persuasive power of his office and his legal authority to pressure the prosecuting attorney to bring false criminal charges against the attorney. If this finding were supported by the evidence, it would surely be grounds for discipline or removal of a judge; however, the record does not support this finding.

The record shows that after having considered and approved a petition for allowance of attorney fees in an estate, the judge received a telephone call from the executrix of the estate, in which she complained about the attorney fee allowed

by the judge. The judge told her that he had merely granted the fee in the amount that she had requested in the petition. The executrix replied that she had not signed that petition. Whereupon the judge went to the courthouse, got the file, and went to the home of the executrix. The testimony of the judge at our hearing, which is the same as the prosecutor's, picks up at that point as follows:

"Q. All right, continue, Judge Terry.

A. I asked her [Rosalie Niles] to examine the contents of the file, to examine the signatures on various documents which contained what appeared to be her signature. She indicated that she remembered most of the signatures, and that the signatures were hers, and she could recognize them, but that the one on this particular document could not be hers, and she pointed to certain discrepancies between that signature and her normal signature.

Also, she said she could not have signed this document, because she had not seen the paper before. She didn't sign anything without having read it:

Furthermore, the figures on the document were different from what she had understood from conversation with her attorneys that it would be, and finally, that she could not have possibly signed this in the presence of her attorney on November 15, 1973 as the notarized signature had indicated, the signature and the seal of the attorney, for the reason that she had not been in his presence since July of that year.

Q. What did you do after this?

A. I told her that it appeared that she was making a serious allegation regarding an attorney, and I asked her if she was certain that what she told me was true.

She said she was very certain. I said, are you sufficiently certain that if required to do so, you would state this under oath to a Grand Jury? She said, as I recall, that while she has no desire to appear before a Grand Jury, if she was subpoenaed before a Grand Jury, she would have no choice but to tell this story, because it was the truth.

I told her I did not know whether a subpoena would be issued to her for a Grand Jury appearance. I was going to further reprimand the prosecutor of the Ripley County Court for further investigation.

Q. Did you do that?

A. Yes.

Q. When did you do that?

A. The next morning, I believe it was Monday, December 17, 1973, I telephoned Jack Shields at the prosecutor's office located in Batesville, Indiana, and asked him if he could come to Versailles to the Courthouse and confer with me about a matter of some importance.

He said, as I recall, that he would be at the Courthouse with his deputy at 1:30 that afternoon. My recollection is that he appeared at that time, and that I showed him the documents, and it was indicated that a handwriting analysis should be made. I told Mr. Shields I felt that he should confer with this woman, form his own opinion about her statement, see if what she told him was the same as what she told me. Jack assured me that he was going to make such an investigation and thereafter did.

Q. Did he then report back to you that he had made such an investigation?

A. Yes. I might interject that the following day, Tuesday morning, Mrs. Niles telephoned me early that morning, as I recall, at my home, and she said, I want to drop this whole thing.

I asked her the reason why she wanted to drop it. She said she was afraid. I asked her what was the basis of her fear. She said a lawsuit by the attorney involved, and perhaps as she put it, maybe burn her home. She said you see so much on television, it just frightens you. I want to get out of the whole thing.

I told her that there was a penalty for attempting to intimidate a witness, and that provisions for the protection of witnesses were available, and that the Court would, and I feel the prosecutor's office also would see to it that she was protected from threats.

I am not saying that I had information that any threats had been made, only her concern that they would be, or that there could be some consequences which she seemed to fear, the principal one being a lawsuit by the attorney involved.

Q. All right, then what happened next in this estate?

A. The prosecuting attorney and his deputy, and I believe the State Police sergeant came to my office, received custody of the file containing the suspect document,

transported them to the Indiana State Police laboratory in Indianapolis for handwriting analysis, stayed with it. First of all, I believe it was copies of the documents. I was reluctant about the custody point to have the documents out of the custody of the Court, and Mr. Shields, as I recall submitted copies of the documents to the handwriting expert, Indiana State policeman.

The expert indicated that copies are difficult to work with; originals are much better.

I did release the file to Mr. Shields. He did as I said, in the company of Mr. Westhafer and a State Police sergeant, or State Police detective bring the files to Indianapolis, submit them for analysis, returned on the same day to Versailles, and reported to my chambers, gave me a copy of the handwriting report in which I believe three or four signatures were examined. All of them were found to be genuine, except one with respect to one which Captain Buck, Douglas Buck, the handwriting expert indicated in the report that the signatures appear to be genuine. However, there are obvious variations in certain of the upper case letters, that is the R and N in the woman's name.

Q. Now is that the report which bears the date early January of 1974?

A. I believe it is.

Q. All right, Judge, then what did you do after that in regard to this Rosella Niles matter?

A. Mr. Shields indicated to me that the report showed there was no evidence of forgery. I didn't read the report in this case, and I believe I so advised Mr. Shields. He said there was a further problem, the woman had changed her story, the story that I had related to him was the story that she had related to me. And I believe Mr. Westhafer took the same position that Rosella Niles had stated in her story. She had become uncertain, become indifferent, couldn't remember, just didn't know. I felt that the prosecutor's office was receiving different information from what the Court had received about this matter. I therefore caused Rosella Niles to be called to the Courthouse and asked the prosecutor to be present for purposes of an interrogation to see what story she would give when confronted by both the prosecutor and the Judge.

Q. Under oath?

A. Under oath.

Q. Now was this done?

A. This was done.

Q. Explain to the Court what happened when this was done.

A. When Mrs. Niles came to the Court, she came in the company of her husband. Mr. Shields came with Mr. Westhafer, his deputy. I was in. I asked Mrs. Niles and her husband to come in the Courtroom, to my chambers, which they did. I asked Mr. Shields to come in the Courtroom. He at first displayed some reluctance. In fact, he came back out of the Courtroom when he saw Mrs. Niles. He said this is a conflict of interest or—no, strike that, not a conflict of interest, this is a violation of ethics. I said what ethics are you talking about, Jack? He said, I don't, if this is a hearing in the estate matter, I'm not the attorney for the estate, and therefore I should not hear it. And her attorney, if she has one, is not here. I knew she had one. I told him I didn't consider this a hearing on the estate matter. It was part of an investigation of what might be fraud perpetuated on the Court and on the estate, and could include criminal conduct. And I felt therefore he should be present.

We didn't pursue it, as I recall. Then I went in the Courtroom and I swore the witness and not from the bench, but we were in the Courtroom, in order that we could use the facilities for recording testimony that are physically present in the Courtroom. I read to Mrs. Niles the statutes in relation to the crime of perjury. I read her both statutes, I believe.

Q. Crimes on perjury or forgery?

A. Perjury.

Q. All right.

A. I did not read her the forgery statute, the forgery statute is a lengthy statute, and she was not being suspected of forgery at all. I felt however, that she should be aware of what the penalties can be for false testimony under oath.

I interrogated her about the file, went through substantially the same routine that I had done at her home previous to December 16, and with substantially the same results. She confirmed, as I understood it, that she had no recollection of having signed this paper, didn't see how she could have signed it. I questioned

her at length, and Mr. Shields questioned her at about the same length.

Also Mr. Westhafer questioned her. She was under oath. The records were made of her testimony.

In addition to the sworn statement of the executrix that she had not signed the petition, the judge also had seen and examined the report of the State Police handwriting expert. That report is part of our record and is set out below:

"The following described material was substituted to the Questioned Document Section for examination, comparison and report.

Questioned: The 'Rosella Niles' signatures appearing on the following documents:

1. Ripley County Circuit Court Petition For Allowance of Fees to Attorney, dated November 15, 1973.
2. Ripley County Circuit Court Executrix's Final Account, dated December 27, 1973.
3. Ripley County Circuit Court Schedule of Property, dated February 28, 1973.

Exemplars: Extensive known handwriting samples of Rosella Niles appearing on routine business forms and Handwriting Request Forms.

\* \* \*

A careful examination has been made of all the material submitted, and as a result of this study I have the following opinion(s):

1. The signatures appearing on items 2 and 3 are genuine.
2. The signature on item 1 appears to be genuine. The lower case letters of the signature are very similar to the known handwriting examplars of Rosella Niles. Obvious variations exist in the capital 'R' and 'N'."

The judge also knew that the prosecutor had not presented the handwriting expert to the Grand Jury. The Grand Jury did not indict.

There is no evidence that Judge Terry made any public accusations against the prosecutor for his handling of the Grand Jury, much less that such accusations were intended to precipitate an unlawful charge against the attorney. The only evidence at our hearing which describes the alleged mis-

handling of the Grand Jury by the prosecutor is contained in a newspaper article which appeared locally after the Grand Jury had refused to indict the attorney. That article appears as follows:

"COMMITTEE ASKS PROBE OF RIPLEY GRAND JURY CASE

OSGOOD: The Ripley County Citizens for Good Government has asked for an investigation of a recent case before the Ripley Circuit Court grand jury, in which it says evidence of possible forgery was not presented.

\* \* \*

Shields, contacted concerning the Good Government Committee statement, said, 'I have never withheld any information from the grand jury. If they choose not to subpoena a person and to rely upon a written report they can.'

He added that the grand jury was still eligible to be recalled until the end of the month and said he invites the judge to 'call them back in again' if he desires. The only person who had ever complained to him about the matter, he said, was the 'judge of Ripley circuit Court' (Judge Terry).

The Citizens for Good Government Committee was organized by Burns and other Ripley County residents to support Ripley Circuit Judge Lendall B. Terry's defense of misconduct charges, filed by 10 Ripley County attorneys and investigated by the Indiana Supreme Court's Disciplinary Committee headed by John B. Ramming."

This article relates what Mr. Burns said about the prosecutor's handling of the Grand Jury and not what Judge Terry said about it. It also describes what Judge Terry said to the prosecutor, and it is the prosecutor who makes these statements of the judge public. While the record does disclose that Mr. Burns' committee was publicly defending the judge's position in the disciplinary proceeding, and the judge was not objecting to their furtherance of his interests, in this particular instance, it is the prosecutor who clearly brings the court forward and identifies the judge and the court as being the source of the public criticisms being verbalized by the Burns' committee. The record does not support the conclu-

sion that the judge took his case against the attorney and the prosecutor to the public.

In like manner, the record does not support the conclusion that the judge had "full knowledge that the evidence would not warrant a conviction." The judge was faced with crime committed in court when the forged pleading was filed with him. He was a witness and a judge. At stake were the penal interests of the State, the interests of the heirs, and the interests of the court itself. He had before him the testimony of the executrix that she had not signed the petition for allowance of fees, and the very uncertain report of the handwriting expert. There is a reasonable probability that this evidence, if presented to a jury would have resulted in a conviction for forgery. In my opinion, the judge acted reasonably here, when faced with a probable crime in court, and did not take his case to the public.

The hearing officer made the following finding:

"4. That Respondent intervened in hearings in his court by lengthy questioning of witnesses; and attributed wrongdoing to certain attorneys in representation of their clients, all in open court and before parties and witnesses; that Respondent in open court questioned the integrity of attorneys and that Respondent accused said attorneys of allowing their clients to enter into a property settlement agreement without their clients' knowledge or consent despite the fact that the clients had signed the property settlement agreement and despite the fact that the plaintiff had testified that said property settlement agreement was drawn in accordance with her instructions; and that Respondent accused one attorney in open court and before his client of failing to represent the client;"

The record provides a rational basis for the intervention of the judge in the hearings described. In one case, the attorney for the defendant had at one time been attorney of record for the plaintiff. The lawyer had switched sides in the lawsuit and the court delved into the matter and refused to sanction a settlement which had been reached in the case. In a divorce case the husband testified that he hoped for reconciliation with

his wife and that he was under psychiatric care and had previously experienced emotional problems. The court was asked to approve a settlement agreement executed by this man, and he quite properly asked the witness questions concerning his state of mind in furtherance of the court's duty to determine the fairness and voluntariness of the agreement.

In yet another divorce case, profferred settlement agreement contained no provision for support by father for minor children. The wife and mother who was to have custody testified that she did not want support from the husband for the children, since she did not want the husband coming around and she thought that he would lose interest in the children if no support was being paid. She testified further that her attorney had advised her that she should request support but she chose not to. The court questioned the witness, refused to approve the agreement and told the attorney in open court that he had not "adequately represented" his client. The court ultimately added $12.50 per week support for each child to the agreement and approved it in that form. While I think the judge should have made his remarks to the attorney in chambers or side bench, I do not think his failure to do so constituted a violation of ethical standards. It should also be pointed out that the attorneys criticized by Judge Terry in these cases were not Ripley county residents, but came from surrounding counties.

The following finding was made:

"6. That Respondent found Marjorie McClain in direct contempt of court when he knew that said finding was not supported by the evidence, was legally objectionable, and after stating in open court that he was not convinced that direct contempt had taken place but that in the slow progress of an appeal the sentence, if imposed, would be served before the determination of such appeal; and that Respondent did not impose a jail sentence and said action was subsequently dismissed;"

Previous to the contempt finding, the judge had made an order

pursuant to the authority granted by IC 1971, 11-5-3-2, being Burns § 13-1006, and IC 1971, 11-5-1-12, being Burns § 13-1011, that parents be permitted to visit with their children being detained in the county jail between the hours of 6:00 and 8:00 p.m. During a juvenile hearing at which the matron of the jail was present, the mother of a juvenile testified that she had been refused the right by the sheriff to visit her son the previous evening between 6:00 and 8:00 p.m. The judge then called the matron before the bench and questioned her as follows:

"Court: State Your name.

Mrs. McClain: Marjorie McClain

Court: Are you employed?

Mrs. McClain: Yes, sir.

Court: What do you do?

Mrs. McClain: I am the matron of the Ripley County Jail.

Court: You're the matron of the Ripley County Jail?

Mrs. McClain: Yes, sir.

Court: Were you on duty last evening between the hours of 6:00 and 8:00 p.m.?

Mrs. McClain: Yes, sir.

Court: Was Officer Parris also on duty?

Mrs. McClain: Yes, sir.

Court: Who was in charge?

Mrs. McClain: Officer Parris was in the office. The Sheriff is in charge.

Court: Was the sheriff also on duty?

Mrs. McClain: Not at that moment, no, sir.

Court: Now Mrs. McClain have you ever had occasion to see an order from this Court filed July 25, 1973 setting forth the jail rules, the rules for jail control in the Ripley County Jail?

Mrs. McClain: Yes, sir, I've seen that order.

Court: Are you familiar with its contents?

Mrs. McClain: Yes, sir.

Court: Are you familiar with a provision therein which states as a rule for jail control, parents of children under eighteen years of age shall be permitted to visit their children who may be detained in the jail's

juvenile quarters on any evening between the hours of 6:00 and 8:00 p.m. or at such other time as the Court may direct? Are you familiar with that order?

Mrs. McClain: Yes, sir.

Court: Do you know whether its ever been violated?

Mrs. McClain: Yes, sir, it has.

Court: It has been?

Mrs. McClain: Yes.

Court: By whom?

Mrs. McClain: Well, I would have to speak as our whole department.

Court: The entire sheriff's department?

Mrs. McClain: Right, sir.

Court: Pursuant to what authority?

Mrs. McClain: May I speak now? Is that what you want to know sir?

Court: Go ahead.

Mrs. McClain: First of all we never know who is going to be there. There's always someone there, sometimes its just me. Second of all, I plan to have our evening meal at 5:30 if possible, unless something happens to detain us. It is really an uncomfortable hour to let visitation every evening. There's not too many offices in this county that I know of that are open seven nights a week. It is really hard on us due to that we don't have the manpower. If the judge could see fit to help us get more help then we would be more than happy to abide by this order.

Court: Let me ask you Mrs. McClain, are you telling the Court that you cannot or that you will not comply with the order of this Court?

Mrs. McClain: Well, in all honesty, I'm afraid I'd have to say a little of both. We cannot and will not.

\* \* \*

Mrs. McClain: You asked me for the truth, I told you the the truth and if you want any further I would like to call an attorney."

After this, the matron appeared with her lawyer, and the lawyer and the court had a long discussion about the matter, during which the judge examined the law with regard to direct and indirect contempt and during which examination

he simply remarked that, during the appeal from a direct criminal contempt, he did not think the law provided for a stay of the execution of any punishment which the court meted out. The judge stated:

"With respect to direct contempt however, as I understand the law the case is different, and the Court may punish without a change of judge and without filing an affidavit or filing a written, or filing a rule to show cause or pleading or paper of that type. And if a person is found guilty of direct contempt of court he may be punished by a fine and/or imprisonment, and of course he may appeal therefrom, but I believe the Supreme Court of this state has held that he may not be released from custody just because he has filed an appeal. Knowing how long appeals take and knowing that the law says three months for a particular contempt is all you can, is the maximum incarceration, the incarceration might be over before the appeal got filed. So what I've heard, which might be the person held in contempt and imprisoned for his or her contempt might very well in a given case ultimately prove that the judge finding her in contempt was technically wrong for some reason, but none the less it would be a fact, an historical fact, that the three months would have been served. All of these considerations enter into what to do about a wilful violation of the order of the court and the law of Indiana by the sheriff's department."

The lawyer for the matron testified at the disciplinary hearing that he was shocked by this "threat" to his client. I am not shocked by this reference, neither do I consider it to have been improper. The judge went on to take the matter of punishment under advisement to permit the lawyer to file a brief, and ultimately the judge dismissed the contempt proceeding altogether, obviously convinced by counsel's brief. I see nothing here which resembles judicial misconduct.

The following findings were made:

"7. That on February 11, 1974, ten attorneys of the twelve attorneys then practicing in Ripley County filed a request for an investigation of the Respondent by the State Disciplinary Commission; that in matters in which Ripley County attorneys participated in Respondent's court, delays were occasioned in receiving settings for hearings and

trials, inheritance tax orders and petitions, contempt citations, appointment of Administrators and Executors, and final accountings; and that such delays were not occasioned in matters involving attorneys whose offices were in adjoining counties; that Respondent failed to timely expedite the operation of his court by causing long delays in entering orders, causing difficulties with the examination of abstracts and payment of inheritance taxes in matters in which Ripley County attorneys represented clients; that Respondent did not cause such delays when other attorneys represented clients; that Respondent subjected lawyers to inquiries in Chambers and from the Bench as to the request for investigation filed with the State Disciplinary Commission when said lawyers appeared before Respondent on matters unrelated to the investigation; that Respondent in open court attempted to intimidate and belittle attorneys by questioning them about the request for investigation they had filed with the Disciplinary Commission; that Respondent publicly maligned the integrity, intentions, honesty and ability of practicing attorneys in Ripley County who signed the request for an investigation; that on March 12, 1974, in the case of *Rosalie Wenning* v. *Edwin Terry Bawley*, Cause No. J-72-19, being a paternity action which was submitted for hearing before the court, in open court and with parties and witnesses present and while on the Bench, Respondent questioned attorney Jack Shields extensively concerning his participation in and motives in filing a petition for investigation with the Disciplinary Commission; that said examination by Respondent amounted to a cross-examination and that the same included innuendoes of wrongdoing; that Respondent actively participated in and encouraged the 'Citizens for Good Government' to use means to influence the Supreme Court of Indiana and the Disciplinary Commission in their decision in this matter; and that Respondent has interfered with the orderly process of the Indiana Supreme Court Disciplinary Commission as prescribed by Indiana Admission and Discipline Rule 23, by retaliating against the complainants and the Executive Secretary of the Indiana Disciplinary Commission by such methods as attempting to institute prosecutions for contempt, forgery and perjury, failing to process in an orderly fashion legal matters in which the complainants appeared as counsel, and publicly maligning the honesty and professional integrity of the complainants and the Executive Secretary at meetings and in open court;

8. That the actions of Respondent on the Bench and in public have tended to belittle and ridicule the lawyers of

Ripley County and that said actions have undermined the individual and general reputations of said attorneys and the Bar of Ripley County, weakening or destroying the confidence which must exist as the basis for a proper attorney-client relationship; that the existence of the investigation became common knowledge in Ripley County and southeastern Indiana by reason of Respondent's actions as evidenced by widespread dissemination of such fact through advertisements in the public press, by handbills and in public meetings held throughout the county; and that such widespread dissemination has polarized public opinion as to this matter, making the fair and impartial selection of a jury questionable in matters pending before Respondent's court in said county in which Ripley County attorneys participate;"

At the heart of the matters treated by these findings is the deep seated alienation of the court and the local bar. At the outset of the judge's term on January 1, 1973, he started a new policy for that court of carefully scrutinizing attorney fees in estates, divorces, and note cases. He also concerned himself with the level of legal representation which the lawyers were providing and the ethics of the local profession. In the conduct of open court hearings, the judge would tirelessly read the pleadings and discuss the applicable law. The attorneys became of the opinion that he was taking too much time at this. He likewise engaged openly in political matters of the county and appointed people to his staff and to boards who were friendly towards him. While one might legitimately contend that he engaged in political action excessively for a judge, one cannot, as I see it, fault him in his stated purpose to scrutinize legal fees and legal representation. He carried out this policy impartially and from the outset of his term of office. This is supported by the record discussed in relation to Finding number 4. Those inquiries conducted by the judge involved counsel from other counties and occurred prior to the time the lawyers filed their claim of misconduct.

When, in October of 1973, the judge was found in contempt of this Court, the lawyers of the county seized upon

their opportunity to rid themselves of the judge before whom things did not go as smoothly as they would have liked. They filed their claim of misconduct on February 11, 1974, against the judge in the aftermath of that contempt finding and during the period when the judge had brought the alleged forgery by the attorney to the attention of the prosecutor and was pressing the prosecutor to present all the evidence on the matter, including the vascillating handwriting expert, to the Grand Jury. That claim of misconduct, signed by ten of the twelve lawyers in the county reads as follows:

"INDIANA SUPREME COURT DISCIPLINARY COMMISSION REQUEST FOR INVESTIGATION

We wish to submit for consideration by your commission the following complaint and information respecting:

ATTORNEY'S NAME—Hon. Lendall B. Terry

ATTORNEY'S ADDRESS—Ripley Circuit Courthouse, Versailles, Indiana

NATURE OF COMPLAINT AGAINST THE ATTORNEY:

The undersigned, members of the Ripley County Bar, verily believe and state that the respondent judge is guilty of numerous acts of misconduct in the performance and conduct of his judicial office.

In and out of court he has uttered false charges of impropriety and misconduct directed to individual members of the bar, charges which are not only unfounded but which have served to demean the honor and reputation not only of the individual lawyer, but of our bar as a whole.

The respondent judge has conducted numerous interviews and communications calculated to influence judicial action on his part where the interests to be affected were not represented before the court. We of the bar are concerned and believe that the respondent judge is using the power and prestige of his office to persuade and coerce others to engage in proceedings motivated solely by the passion, interest, and desire for retaliation on the part of the respondent judge to the extent that the ability of bench and bar to administer justice, civil as well as criminal will be irreparably damaged and materially impaired.

The respondent judge has violated the letter and intent of his oath as an attorney.

> The respondent judge has violated the letter and intent of the preamble to the Code of Judicial Conduct and Ethics and specifically the provisions contained in paragraph 1, 2, 3, 5, 6, 7, 8, 9, 10, 16, and 17 of said code.
>
> In filing this request for investigation, we agree to conform with the following: To cooperate with the commission and its agents in the matter of obtaining evidence: To agree to testify at any hearing which may be held in this matter: To keep confidential the filing of this grievance, and the facts involved, except from those people directly involved in the investigation of this matter.
>
> We affirm, under the penalties for perjury, that the foregoing representations are true."

The vast majority of all the delays in court and the in- and out-of-court inquiries which the judge made of the lawyers of which the lawyers complained before our hearing officer, occurred between February 11, 1974, the date on which the judge received notice that the above claim had been filed, and April 22, 1974, the date on which the disciplinary hearing commenced. From February 11, 1974, until March 20, 1974, the date upon which our Disciplinary Commission filed its complaint, the judge knew only that he was under investigation for nothing more than a charge of unbecoming conduct. That he should respond to this vague claim of misconduct, by making inquiry of the lawyers as to what was meant by it, seems a reasonable response to me. There is no evidence that he interrupted a trial solely to make this inquiry. It seems to me that he had a right to make those inquiries in public or in private or anywhere, so long as he did not disrupt the orderly procedures of his court in so doing.

In the Wenning case, which is specifically referred to in the finding, the plaintiff in a paternity proceeding appeared by counsel. The prosecutor appeared for the defendant. The prosecutor set up a tape recorder which had been purchased with funds from LEAA. The attorney for the plaintiff objected to a private recording being made of the proceeding. In dealing with this legal objection, the judge interrogated the prosecutor with regard to his purpose for making the record-

ing, since the prosecutor had not done such a thing for eight years. In so doing, he asked the prosecutor if it was not true that he was making the recording to gather evidence against the judge for the Disciplinary Commission. The negative answer of the prosecutor did not identify any circumstances or peculiarities in the case which would appear to justify the need to have a private recording, given the presence of the court reporter for the purpose of making such a record. However, here the point is, that there was a proper judicial inquiry into the purpose of the tape recorder, which quite naturally drew the pending disciplinary investigation openly into the court proceeding. This is not a showing that the judge willy-nilly interrupted open court proceedings for the purpose of embarrassing the lawyers and thereby disrupted the orderly conduct of court proceedings.

On the issue of delay, it should be noted that no job was totally left undone by the judge. No one has charged that the judge was incompetent in that he had no regard for or knowledge of the law. All orders were signed and emergency matter given attention, even during the time when the judge was required to prepare his defense to the disciplinary proceeding. Also on this issue, it should be noted that none of the lawyers who testified most fervently on this issue took any special steps to obtain expeditious consideration of their matters. The matters got dropped on the judge's desk or mailed to him for his consideration. Several of the estates, in which the judge delayed in making orders after February 11, had been pending for long periods of time.

## IV.

### CONCLUSION

I find no fault with our Disciplinary Commission in this case. The preliminary investigation would have provided reasonable cause to believe that the respondent judge was guilty of misconduct. It is not, however, so easy to understand why this claim of misconduct signed by the lawyers

was not recommended for dismissal on the ground that it raised "no substantial question of misconduct" as provided by § 10(a)(1). No lawyer or judge should even be subjected to an investigation without a more specific allegation of misconduct. Some identifiable and specific act or utterance must be identified in the claim of misconduct. We should not subject lawyers or judges to investigation upon a claim that they are "bad guys."

And I also find no fault in our hearing officer. He conducted a fair hearing. The findings are quite correctly those which tend to support the issues upon which the Commission carried the burden at the hearing. I simply differ with him on the significance which the evidence has in relation to the operation of the Ripley Circuit Court and on the scope of permissible response for a trial judge under the circumstances of this case.

Upon a finding that the evidence is insufficient to support the findings and that the evidence does not support a finding that the respondent was:

1. neglectful of or grossly incompetent in performance of official duties, or

2. engaged in conduct which was disruptive of the orderly processes of the court,

I would enter judgment for respondent accordingly.

### CONCURRING AND DISSENTING OPINION

PRENTICE, J.—I have reviewed the evidence presented in this matter and I agree that upon the "sufficiency" standard employed by this Court in matters on appeal, the hearing officer's findings are well supported. However, the hearing officer in these proceedings is an agent of this Court. His findings are our findings. Thus when their correctness is challenged, we are at liberty to review the evidence de novo and substitute our findings for those of the hearing officer, if reasonable minds might differ. The gravity of the charges

and the extreme action insisted upon by the majority compelled my detailed and very time-consuming review in this case.

It would serve no useful purpose to detail here my points of departure from the hearing officer's findings, as I have been unable to convince my fellow justices of the correctness of my conclusions. Suffice to say that in my opinion, the evidence upon certain issues convinces me that the respondent is not temperamentally suited to the office he holds and has evidenced this by numerous acts of indiscretion tending to disrupt the judicial process and discredit the bench and bar. Accordingly, some disciplinary action is not only warranted but compelled. However, upon the more serious issues, those which if resolved against respondent mandate his removal, I do not find the evidence convincing to the degree that I would require before taking the extreme action adopted by the majority. So long as our trial judges are elected upon party tickets by popular vote—a tradition which the circumstances of this case indicates should be reversed—there will be fractional battle lines drawn and infighting that cannot but splash upon and adversely affect the court functions. Nevertheless, this at present is our system, and I think that we should override the mandate of the electorate under the authority of Article 7, Section 4 of our state constitution, only upon clear and convincing evidence that the responsibilities and duties of the office cannot be otherwise accommodated. To me, the evidence presented upon such charges does not rise to that level. Upon the less serious charges, I think the evidence clearly supports a finding of misconduct and warrants a reprimand and suspension for some brief and specified period. That such action might not remedy all of the unfortunate problems apparently existing between the bench and bar of Ripley County, to me, does not warrant our action today.

NOTE.—Reported at 323 N.E.2d 192.

## ON PETITION FOR REHEARING

HUNTER, J.—Petitioner was suspended without pay from the office of circuit judge of Ripley County in an opinion handed down by this Court on February 20, 1975, and reported at 323 N.E.2d 192. In his petition for rehearing, the only question presented by petitioner, and not considered in our original opinion, is whether petitioner's suspension denies him equal protection of the laws as guaranteed by the Indiana and United States Constitutions. We conclude that petitioner's equal protection rights were not violated by his suspension and deny his petition for rehearing.

Petitioner bases his equal protection claim upon the action taken by this Court in another disciplinary action involving a circuit judge, *In re Evrard* (1974), Ind., 317 N.E.2d 841. Petitioner asserts that the conduct of Judge Evrard, while more egregious, resulted in suspension but with pay, while petitioner was suspended without pay for lesser transgressions.

The fourteenth amendment "forbids any arbitrary deprivation of life, liberty or property, and secures equal protection to all under like circumstances in the enjoyment of their rights; and, in the administration of criminal justice, requires that no different or higher punishment shall be imposed upon one than is imposed upon all for like offenses." *Ex Parte Kemmler* (1889), 136 U.S. 436, 448-49, 10 S. Ct. 930, 34 L. Ed. 519, 524. While we do not have before us a case involving the administration of criminal justice, nevertheless, petitioner's equal protection claim must be measured by the standard enunciated in *Kemmler*.

As the response of the disciplinary commission to the petition for rehearing points out, the action taken with regard to Judge Evrard was interim relief only and largely in aid of the due process rights of Judge Evrard to prepare his defense. There has been no final determination of any violations of the Code of Judicial Conduct by Judge Evrard, and that matter is

still pending. The action taken by this Court in suspending petitioner, however, was made only after a full hearing before a hearing officer at which petitioner presented evidence and after oral arguments were heard by this Court upon the findings and conclusions of the hearing officer. Equal protection of the laws does not mandate similar treatment for those individuals who are not similarly situated. Such is the case presented by this petition for rehearing, which is hereby denied.

Givan, C.J., Arterburn and Prentice, JJ., concur; DeBruler, J., votes to grant rehearing.

NOTE.—Reported at 329 N.E.2d 38.