IN THE MATTER OF NOBLE K. LITTELL.

[No. 872S110. Filed April 3, 1973.]

*Robert F. McCrea, McCrea & McCrea,* of Bloomington, *Henry C. Ryder, Roberts & Ryder,* of Indianapolis, for respondent.

*Jerrald Crowell,* of Fort Wayne, *John B. Ramming,* of Indianapolis, attorneys for Indiana Supreme Court Disciplinary Commission.

PER CURIAM—This is a disciplinary proceeding filed by the Disciplinary Commission of this Court upon the original complaint of one Julia Fulford, wife of Max Fulford, who will be hereinafter mentioned. We have before us the complaint and answer and the findings and recommendations of the hearing officer, together with the petition for review filed by both the Disciplinary Commission and the complainant and the response thereto by the respondent. The petition of the complainant seeks action by this Court requiring the respondent to compensate her and her husband for financial loss alleged by her to have been incurred by them as a result of the respondent's misconduct. Her petition is denied. Although it may be appropriate, in a given case, for us to require restitution of a liquidated sum as a condition precedent to reinstatement following suspension, the redress of private wrongs is not the mission of our disciplinary rules. Further, there was no evidence presented from which a determination of such issue could have been made, and we have merely the complainant's allegations and conclusions upon the subject.

The petition of the Disciplinary Commission is now granted. We have reviewed the evidence and, in essence, our findings coincide with those of the hearing officer. However, inasmuch as we are not in accord with his recommendation, we think it appropriate to make an independent statement of the facts. They are essentially undisputed and are as follows:

The respondent is a member of the bar of this Court, having been duly admitted in the year 1954. On January 1, 1963, he took office as Judge of the Morgan Superior Court, Morgan County, Indiana, which office he now holds and has held continuously since that date. On several occasions prior to the occurrences that gave rise to the Fulford complaint, one James Arthur had appeared before the respondent, as Judge of said

Court, charged with minor criminal offenses. Arthur was a local musician and vocalist, and he had written a musical composition and lyrics depicting the court and his experiences there. The respondent was, in some manner, characterized in the ballad, and it came to his attention. He and a companion went one evening to a local tavern where Arthur was employed and there had him sing his song for them. After hearing it, the companion suggested to Arthur that he have it recorded for commercial distribution, and the matter was discussed between them. Later, Arthur went to the respondent and requested financial assistance towards having the record made, and the respondent indicated his interest in the project. Encouraged by the respondent's reaction, Arthur next went to Max Fulford, husband of the complainant, who was engaged in the recording business upon a part time basis. He agreed with Fulford to pay the sum of $350.00 for production of an undisclosed number of records, subject to the respondent's approval and willingness to give financial backing. It is not clear from the record whether the respondent was motivated by his intrigue with the song and novelty of recording and publishing it or by a genuine selfless desire to help rehabilitate Arthur. It is clear that there was an understanding between him and Arthur that he would be repaid from the earnings of the record and that he would receive a record.

The production procedure required a recording session in Fulford's studio at which a magnetic sound tape was made and a subsequent "pressing" or manufacture of the record from a playback of the tape. Fulford was not equipped to perform the "pressing" operation, and it was his practice to have it done by a studio in Chicago. The respondent attended a rehearsal session of the musicians and the recording session, both held in Fulford's studio, and he paid Fulford the sum of $350.00 on behalf of Arthur. The tape was made at the recording session held on Sunday, May 16, 1971. Thereafter, several inquiries by Arthur to Fulford concerning

delivery of the finished records were met with various excuses for the delay, but the records were never forthcoming.

Fulford had previously become financially irresponsible, as well as insolvent. Earlier, he had written checks against his depleted bank account in anticipation of future deposits reaching the bank before the checks cleared for payment. On February 17, 1971 he had issued a check for $20.00 to a grocery establishment. It was dishonored by the bank, and the payee filed criminal charges in the Morgan Superior Court. Fulford appeared, without counsel, before the respondent as Judge of that Court on May 15th, the day before the recording session, and entered a plea of not guilty. Upon determining that Fulford had no prior arrests, the respondent released him upon his own recognizance. On June 18th, Fulford returned to court for trial, again without counsel, but this time before a judge pro tem. In the meantime, early in May, he had seen the prosecutor in the Clerk's office, and the prosecutor, who had previously sent him a notice to make restitution upon the check, informed him that it was not the policy of his office to prosecute persons who made good faith efforts to make such restitution. Fulford, at this meeting, offered the necessary funds to make restitution, but the prosecutor declined, saying that his secretary took care of such matters and that his office was closed that day and would be closed on the following day because of the primary election. Fulford was under the impression that the matter was concluded, but the prosecutor inadvertently failed to notify his secretary of the conversation, and the following week Fulford received a notice to appear for trial on June 18th. It is not disclosed whether restitution was made before or after receipt of such notice, but it had been made prior to June 18th, when Fulford appeared, as ordered. He met the prosecutor and his deputy and refreshed the prosecutor's memory upon the earlier events. The prosecutor acknowledged partial blame for the confused state of affairs, and he and the deputy went into conference in chambers with the pro tem judge. Returning

from the Judge's chambers, the prosecutor announced to Fulford that if he would enter a plea of guilty, there would be no fine or sentence imposed but that the matter would be taken under advisement. Fulford did change his plea to guilty, and upon the prosecutor's recommendation, the court took the matter of sentencing under advisement and admonished Fulford, "* * * If anything like this happens again you can be called back in for sentencing over again and it would not be necessary to have a trial if the court would so see fit, * * *."

The aforementioned action by the judge pro tem was in accordance with a custom prevailing in the Morgan Circuit Court, a practice which we know also obtains in other areas throughout the state. Although practical benefits may sometimes flow from such practice, the dangers inherent therefrom render it one that this Court can neither sanction nor condone. It amounts to a de facto suspension of sentence but with the court retaining an arbitrary power to determine when and upon what conditions the suspension may be revoked. We have recently spoken concerning limitations upon the authority of courts to revoke the suspension of sentences. *State ex rel. Gash* v. *The Morgan County Superior Court, etc.* (1972), 258 Ind. 485, 283 N. E. 2d 349. It is by coincidence only and of no consequence that the *Gash* case concerned the same court and the respondent herein. Our opinion in that case recognized that even persons under suspended sentences have a right to know where they stand and that they should not be subject to arbitrary power resting within the breast of the court. The indefinite deferral of sentencing, without statutory authority or other sufficient cause, is not within the court's discretionary powers. It was this improper practice, we believe, that led the respondent into grievous abuse of his power. Our authority as judges is awesome. Our power is even greater. It is commanding, therefore, that we constrain ourselves at all times to the proper exercise of that power and that we be ever mindful of our frailties, as men, and of the devastation

that we wreak, when we permit the men that we are to overpower the judges that we have undertaken to be.

A week or so following the making of the master tape in Fulford's studio, Arthur made inquiry of Fulford as to when he would receive the records and was advised that the records could not be made, because the song had not been protected by copyright. Arthur relayed this information to the respondent, who informed him that a copyright was not necessary. In the meantime, Fulford and Donald Scales, his associate in the recording studio venture, had become estranged over financial matters; and Scales had removed his personally owned equipment from the studio. He had also taken the Arthur master tape, as security for money owing him from Fulford for his services in making it. In early August, Arthur went to Scales and asked if he had the tape. Scales replied that he did and gave his reason for holding it. Scales was also aware of the respondent's interest in the tape and suggested that they go discuss the problem with him, which they did. In this conference, respondent-judge stated that he had a fraudulent check charge hanging over Fulford's head, that he wanted the record "pressed" and for Arthur to tell Fulford that he should "get the tapes out" or he, the respondent, would "pull the check thing on him." In this subsequent conference between respondent-judge and Arthur, he told Arthur to tell Fulford that he, the respondent, wanted to see Fulford and that unless he appeared by 9:30 a.m. the following day, the respondent would issue a warrant for his arrest for embezzlement. On this occasion, the respondent further announced to Arthur that he would not go to Fulford but would have him brought to him and that he was seriously thinking about embezzlement charges. This conversation took place shortly after Fulford filed a voluntary bankruptcy petition and subsequently an amended schedule of unsecured creditors, among whom were listed the respondent and Arthur. A short time later, Attorney Eltzroth, who was representing Fulford in the bankruptcy matter, advised him that he had received word

from the respondent that he was going to file theft charges against Fulford if he did not repay the money in question. Fulford telephoned the respondent who said "Yes, I have on my desk the affidavit." And he read it to him and said that he had not signed it yet and probably would not until the first of the week but that he would do so if the money was not paid. This appears to have occurred about the time the notice to creditors was issued, which was on September 21, 1971.

On September 23, 1971, the respondent caused a notice to be mailed to Fulford for him to appear in court on October 4th at 1:30 p.m. for sentencing on the fraudulent check charge. The notice was received on September 25th. Fulford and Attorney Eltzroth had not agreed concerning the listing of the respondent and Arthur as creditors in the bankruptcy proceedings. Neither did they agree with respect to the course of action to take concerning the respondent's pressure to pay the debt, and one hour before the scheduled hearing, Attorney Eltzroth declined to represent Fulford in the matter. Fulford went to court alone shortly before the time specified in the notice but was advised by the court reporter that his case had been called at 9:30 a.m. and that a bench warrant for his arrest had been issued, inasmuch as he had not appeared at that time. Fulford went to his home and made a number of telephone calls in an attempt to enlist the aid of another attorney. A friend referred him to Attorney Larry Pugh, in Indianapolis, whom he contacted and arranged to meet on the following day. At that meeting, Fulford apprised Attorney Pugh of the circumstances hereinbefore related and told him that, in his opinion, he was being called into court to answer for the debt and because he had listed the debt in the bankruptcy schedule.

Relying upon what Fulford had told him, Attorney Pugh went to the court on the next day, October 6th. He filed a motion to recall the arrest warrant and to withdraw the plea of guilty, and he attached the restitution receipt and the notice to appear for sentencing as exhibits. He requested

and was granted a meeting with the respondent in his chambers, where the matter was reviewed. He convinced the respondent that there had been some confusion between the court and Fulford regarding the time that Fulford was to have appeared on the 4th, and the respondent did recall the arrest warrant. A bench docket entry was made indicating also that the motion to withdraw the guilty plea was sustained, but from Attorney Pugh's testimony and from subsequent proceedings, we conclude that this was entered by error. In the conversation that passed between Attorney Pugh and respondent, the attorney related his client's opinion as to why he was about to be sentenced and asked if payment of the money would have any bearing upon the case, to which the respondent replied that if the money was paid to Arthur, Fulford would spend no time in jail. Respondent further volunteered that he was attempting to rehabilitate Arthur and that it would ruin his rehabilitation program if he were to allow Fulford to sit around in bars and to brag that he had been able to cheat the judge out of the money. The cause was continued until October 21st, with the understanding that the attorney was going to try to have Fulford raise the money. The attorney testified that although he did not approve of the proceedings, he did advise Fulford, as a practical matter, to pay the money and that he was going to spend some time in jail if he did not.

Apparently, the hearing set for October 21st was continued to October 26th. As attorney of record Mr. Pugh received a notification of the sentencing hearing. He telephoned the respondent and told him that Fulford had not been able to raise the money, and the respondent advised him to have his client in court as notified and to have him bring his shaving kit. Attorney Pugh and Fulford appeared before the respondent on October 26th. Fulford was instructed to take the witness stand and asked if he had anything to say before he was sentenced. Attorney Pugh had prepared a battery of motions but first asked if the court had ruled

upon the earlier motion to withdraw the plea of guilty, and the respondent replied that it had been overruled. Counsel next filed a motion for discharge, which was overruled. A verified motion for change of venue was next overruled, as not having been timely filed, then a verified motion for change of judge, for the same stated reason. Counsel had run out of motions and the respondent, without any evidence having been presented, proceeded to sentence Fulford. The sentence? 180 days confinement at the State Penal Farm and a fine of $250.00. Counsel immediately moved orally for the court to set an appeal bond, and it was set at $10,000.00.

The testimony of the respondent was somewhat evasive upon the question of his policy concerning penalties in similar cases. He acknowledged, however, that in two such cases, he had assessed fines of $10.00 and imposed no confinement. He also acknowledged that no pre-sentence investigation had been made in Fulford's case, and that although he had hearsay information that Fulford was generally an unsavory character, he knew of no prior criminal conviction.

Upon the foregoing, we find the respondent guilty, under Count I of the complaint, of violations of Rules 1 and 10 of the Code of Judicial Conduct and Ethics adopted by this Court on March 8, 1971. We further find respondent guilty, under Count I of the complaint of violations of Disciplinary Rules 1-102(A) (1), (5), (6), 7-105(A), and 8-101(A) (2) of the Code of Professional Responsibility for Lawyers, also adopted by this Court on March 8, 1971.

This case has presented some difficulties, in that the action is for disbarment or other discipline action under our rules applicable to the discipline of attorneys, whereas the misconduct of respondent was misconduct in his capacity as a judge. We hold, however, that there is an interrelationship between the disciplinary rules applicable to attorneys and the code of judicial conduct and ethics; and that a licensed attorney, while

serving as a judge, is subject to the stringent requirements of both, insofar as they can be made applicable in furtherance of their purposes as expressed in their preambles. Many of the requirements of the code of professional responsibility are designed to shield the judge from influences that might otherwise be brought to bear upon him and taint the cause of justice. We would be compelled to severely discipline an attorney who seduced the judge to prostitute his office. It would be a paradox, indeed, if we could not discipline the judge in the same manner when his misdeeds are autogenetic.

Conversely, if the lawyer be nefarious in other endeavors, he may not escape accountability under the code of professional responsibility, although his conduct, in professional pursuits, be exemplar.

It is the opinion of this Court that the privileges of the respondent to practice law in this state should be suspended for a period of two years. Under our rules, he may apply for reinstatement only after expiration of such period and may thereafter be reinstated only upon meeting the stringent requirements of Admission and Discipline Rule 23 (4). It is also our opinion that respondent should be removed from office. Logic dictates that if the public interest warrants his suspension as a lawyer, it demands his removal from office. Particularly is this true inasmuch as his misconduct was the abuse of that office. Our jurisdiction in this area is of recent origin, (Constitution of Indiana, Article VII, § 4), and neither implementing legislation nor rules of procedure have yet been adopted. Insistence by the respondent upon a due process hearing upon this issue would have necessarily delayed his removal, thereby casting further unfavorable reflection upon the judiciary. Through his counsel, he has been previously apprised of our decision to suspend, and at our suggestion, he voluntarily tendered his resignation as Judge of the Morgan County Superior Court. Aside from other considerations personal to himself, his failure to complete his elected term

will curtail, by one-third, the retirement benefits to which he otherwise would have been entitled. We would be unworthy to determine the penalty herein, if we were to view only the faults of respondent and none of his virtues. We, therefore, have no hesitancy in recording that we regard his resignation for the good of the judiciary as a laudable act, indicative of genuine remorse for his misconduct and of respect for the judiciary and high judicial standards not displayed in his dealings with Fulford.

Count II of the complaint charged the respondent with misconduct, in that upon two occasions he appointed himself as agent for the state, for the purpose of returning prisoners to the Morgan County Superior Court from distant jurisdictions and upon a third occasion, he appointed himself and his wife as such agents. Such action took place in the years 1968, 1969 and 1970. Respondent, by his answer and by his testimony admitted such appointment and reimbursement for such services. He also acknowledged that such conduct was not in the best interest of the judiciary, in that at best it gave an appearance of impropriety; and he testified that he subsequently considered it an ill-advised practice and had not so acted since the appointment in 1970. Such conduct by respondent was ill-considered and a violation of certain of the canons of professional ethics and judicial ethics promulgated by the American Bar Association; and in no sense do we approve it. However, the codes under which respondent was charged were not then in effect. We, therefore, find respondent not guilty upon Count II.

Upon the finding of guilty under Count I of the complaint, the respondent is hereby suspended from the practice of law for a period of two years, subject to reinstatement at the expiration of said period as provided by Section IV of Admission and Discipline Rule No. 23 of this Court. In order to allow for the appointment by the Governor of a successor to respondent, as Judge of the Morgan County Superior Court

and to provide for the orderly transition, said period of suspension shall commence on May 1, 1973.

Our declination to follow the recommendation of the hearing officer for a less severe penalty is not to be critically regarded. Since the adoption of our new disciplinary rules and procedures, we have determined that the rule requiring hearing officers to make recommendations concerning the discipline to be assessed was ill-considered, in that it necessarily results in a disparity of recommendations that is inconsistent with the paramount consideration of uniformity. Said rule has since been amended.

NOTE.—Reported in 294 N. E. 2d 126.