**In the Matter of Frank R. CALLAHAN.**

**No. 879S212.**

Supreme Court of Indiana.

Dec. 27, 1982.

James F. Stanton, Nick J. Thiros, Merrillville, for respondent.

David B. Hughes, Trial Counsel, Indianapolis, for Indiana Supreme Court Disciplinary Com'n.

## PER CURIAM.

This disciplinary matter is before us on a one-count verified complaint which charges the Respondent with engaging in misconduct dating from 1969 to February 1972, i.e. participating in an unethical, extortionate scheme, whereby he allegedly received money under the guise of legal fees for purposes other than legitimate legal services. During a portion of the period of misconduct the appropriate standards of professional conduct, as recognized by this Court, were set forth in the *Canons of the American Bar Association.* *In re Holovachka,* (1964) 245 Ind. 483, 198 N.E.2d 381; *Baker, et al. v. Keisker,* (1957) 236 Ind. 617, 142 N.E.2d 432. The Respondent is charged with violating Canons 29 and 32 which, since March 8, 1971, have been embodied in the *Code of Professional Responsibility for Attorneys at Law,* Disciplinary Rules 1–102(A)(1), (2), (3) and (6).

A Hearing Officer appointed pursuant to Indiana Admission and Discipline Rule 23 has heard the case and has submitted his Report. In a disciplinary case, the ultimate findings of fact are arrived at through an examination of all matters before the Court: *In re Crumpacker,* (1978) 269 Ind. 630, 383 N.E.2d 36; *In re Wireman,* (1977) Ind., 367 N.E.2d 1368, cert. denied 436 U.S. 904, 98 S.Ct. 2234, 56 L.Ed.2d 402; *In re Murray,* (1977) 266 Ind. 221, 362 N.E.2d 128, appeal dismissed, 434 U.S. 1029, 98 S.Ct. 758, 54 L.Ed. 777; *In re Pawlowski,* (1959) 240 Ind. 412, 165 N.E.2d 595. Employing this standard of review we find that the Respondent, Frank R. Callahan,

was admitted as a member of the Bar of this State in 1961. He is presently engaged in the private practice of law in Lake County and, in addition, is serving his third consecutive term as Judge of the City Court of East Chicago, Indiana.

We find further that during the period of time material hereto, the Respondent was engaged in the private practice of law in the City of East Chicago in a partnership with Norbert Wleklinski, under the firm name of Wleklinski and Callahan.

At all times material hereto, Cornel Leahu was the Superintendent of the East Chicago Board of Sanitary Commissioners. Miles Hernly was the President and Director of Hernly Brothers, Inc., a construction company which was the successful bidder of a substantial sewer project in East Chicago to be financed by public bonds. Walter Neimiec was the then President of the East Chicago Property Owners Association, Inc., an essentially "watchdog" organization interested in budgetary and public construction matters in East Chicago. The Respondent became active in the affairs of the Association, held some offices and served as a member of its Board of Directors until approximately 1970. Respondent's partner, Wleklinski was also a member of this Association.

During 1969 the Board of Sanitary Commissioners proposed the construction of the Water Polution Abatement Project (WPAP) to be financed by way of a bond issue. The East Chicago Property Owners Association vigorously opposed the project, threatening numerous and persistent remonstrances. In late June or early July, 1969, Neimiec approached Leahu and threatened to stop the project by using the association as a vehicle, unless Neimiec and others, then unidentified, were paid to forego remonstrances. Thereafter, Leahu met with Neimiec, Wleklinski and Respondent at Leahu's home. Though the Respondent did not participate actively, he was present at all relevant times. During this meeting Wleklinski, with Respondent's knowledge and acquiescence, coerced Leahu into an agreement whereby Leahu persuaded the general con-

tractor of the project, Hernly Brothers, to retain the Respondent and Wleklinski, ostensibly as legal counsel, to handle all legal work arising during the construction activity. On January 11, 1970, the parties entered into an employment contract to that effect. Neither Respondent nor Wleklinski had any experience in handling the legal work of a major construction project.

Commencing in February, 1970, the Respondent and Wleklinski received from Hernly Brothers approximately $2,500.00 each and every month thereafter, ostensibly as attorneys fees for legal work rendered to Hernly Brothers on the project. On most occasions of receipt, a legal secretary in the office of Wleklinski and Respondent converted the checks to cash and returned the money to the attorneys. The $2,500.00 was, on most such occasions, divided and distributed in three equal parts, one each to Wleklinski, Respondent and Neimiec. Neimiec's share was ostensibly being received as a "consultant's fee" for having advised the attorneys on technical aspects of the construction contract. Pursuant to this arrangement, the Respondent received approximately $18,333.00 of a total of $55,000 paid by Hernly Brothers. Respondent, but not Wleklinski, did on occasion do acts and write letters which may fairly be characterized as legal services for Hernly Brothers. However, the nature of work thus done, the infrequency of its occurrance, the fact that neither Miles Hernly, the President of Hernly Brothers, nor the Hernly Brothers Job Superintendent ever once met with Respondent or Wleklinski, establish that the value of these legal services was infinitesimal in relation to the total of $55,000.00 paid. Respondent and Wleklinski never were called upon to perform any significant legal work. Even what little they did perform was of such simple and routine nature as not to require the services of a "consultant".

Further, there is no evidence to show that Neimiec had any level of construction expertise sufficient to hold out as or be regarded by a construction lawyer as a consultant in that field.

From the foregoing findings we conclude that the Respondent did acquiesce and participate in a scheme of extortion and he did receive money as a direct and proximate result of such participation. By so doing, the Respondent engaged in conduct that involves illegality, dishonesty and moral turpitude, and he failed to uphold his duty toward and the honor of the profession. This misconduct further reflects adversely on Respondent's fitness to practice law.

In light of the foregoing, we hold that the Respondent did engage in the misconduct as charged by the Verified Complaint and he did violate Disciplinary Rules 1–102(A)(2), (3) and (6) of the *Code of Professional Responsibility for Attorneys at Law* and Canons 29 and 32 of the *American Bar Association Canons of Professional Ethics.*

In view of our finding of misconduct, we must now determine what sanction, if any, should be imposed in this instance. In making that determination, we take into account the specific acts of misconduct, this Court's responsibility to preserve the integrity of the Bar and the risk, if any, to which we will subject the public by permitting the Respondent to continue in the profession or be reinstated at some future date. *In re Moody, Jr.,* (1981) Ind., 428 N.E.2d 1257; *In re Crumpacker, supra; In re Vincent,* (1978) 268 Ind. 101, 374 N.E.2d 40; *In re Tabak,* (1977) 266 Ind. 271, 362 N.E.2d 475.

In his report to this Court, the Hearing Officer notes that the Respondent's misconduct occurred at the onset of his professional career. In general terms, the Hearing Officer concluded that Respondent merely acquiesced in the activities of his senior partner at a time when he was struggling to make a beginning and was susceptible to the guidance of what appeared to be a successful practitioner. The record also demonstrates this misconduct occurred over twelve years ago and that there is no evidence of misconduct during the interim period.

These findings, however, do not totally mitigate the impropriety of the acts of Re-

spondent. Mr. Callahan breached his duties as a lawyer and betrayed the public's trust. At best, he acquiesced in an extortion scheme. While he may not have orchestrated the plan, he participated in the spoils. A lawyer should not need the experience or guidance of an established partner to appreciate the wrongfulness of his conduct. Economic difficulties and the availability of "easy money" have always been and probably will always be ever-present temptations in the professional life of practicing lawyers. This is the very reason for the existence of our professional rules of ethics. Neither inexperience nor naivete can totally justify the breach of these standards.

This case poses one further consideration in that the Respondent serves as Judge of the East Chicago City Court. Being advised of the pendency of this decision, the Respondent has resigned such office. As this Court has previously indicated, this has to be viewed as a laudable act.

It is the opinion of this Court that the privileges of the respondent to practice law in this state should be suspended for a period of two years. Under our rules, he may apply for reinstatement only after expiration of such period and may thereafter be reinstated only upon meeting the stringent requirements of Admission and Discipline Rule 23(4). It is also our opinion that respondent should be removed from office. Logic dictates that if the public interest warrants his suspension as a lawyer, it demands his removal from office.... Insistence by the respondent upon a due process hearing upon this issue would have necessarily delayed his removal, thereby casting further unfavorable reflection upon the judiciary. Through his counsel, he has been previously apprised of our decision to suspend, and at our suggestion, he voluntarily tendered his resignation as Judge of the Morgan County Superior Court.... We would be unworthy to determine the penalty herein, if we were to view only the faults of respondent and none of his virtues. We, therefore, have no hesitancy in recording that we regard his resignation for the good of the judiciary as a laudable act, indicative of genuine remorse for his misconduct and of respect for the judiciary and high judicial standards not displayed in his dealings with Fulford. [*In re Littell,* (1973) 260 Ind. 187 at 196, 294 N.E.2d 126]

Taking into account all of the above considerations, this Court now concludes that in order to preserve the integrity of the Bar of this State a period of suspension is in order, but that Respondent does not present such a risk as to preclude the possibility of reinstatement at a later date.

It is therefore ordered that by reason of the misconduct found under this cause, the Respondent, Frank R. Callahan, is suspended from the practice of law in the State of Indiana for a period of not less than two years, beginning January 15, 1983.

Costs of these proceedings are assessed against the Respondent.