### In the Matter of David O. CARMANY.

### No. 283S47.

Supreme Court of Indiana.

July 26, 1984.

R. Larry Helmer, Helmer & Nelson, Indianapolis, for respondent.

William G. Hussmann, Jr., Staff Atty., Indianapolis, for the Indiana Supreme Court Disciplinary Com'n.

## DISCIPLINARY ACTION

PER CURIAM.

The Respondent in this case, David O. Carmany, has been charged in a verified complaint for disciplinary action with three counts of misconduct. A Hearing Officer appointed by the Court pursuant to Admission and Discipline Rule 23 has made findings of fact and conclusions of law. The Respondent now petitions for review of the these findings and requests a hearing by this Court on the issue of whether a mental condition can mitigate the discipline imposed.

■ This Court has often examined mitigating circumstances, including emotional disturbances and alcoholism. See gen. *In re Neal*, (1979) 272 Ind. 339, 397 N.E.2d 967 (emotional disturbance); *In re Vincent*, (1978) 268 Ind. 101, 374 N.E.2d 40,

(alcoholism); *In re Althaus,* (1976) 264 Ind. 660, 348 N.E.2d 407 (alcoholism and personal tragedy). Such an issue is not new in Indiana; it is best resolved during this Court's determination of the appropriate discipline. Accordingly, Respondent's Petition for a Hearing is hereby denied.

 Respondent's challenges to the findings and conclusions under Counts I and II of the complaint are based primarily upon a claim that the evidence is insufficient, particularly under the "clear and convincing" standard set out by this Court in *In re Moore,* (1983) Ind., 453 N.E.2d 971, decided after the hearing in this cause. It is well established that, in reviewing disciplinary cases, this Court examines all matters presented, including the transcript. *In re Colestock,* (1984) Ind., 461 N.E.2d 137, *In re Zinman,* (1983) Ind., 450 N.E.2d 1000; *In re Callahan,* (1982) Ind., 442 N.E.2d 1092. The Hearing Officer's findings are treated with due deference, but they are not controlling. *In re Sekerez,* (1984), Ind., 458 N.E.2d 229; *In re Zinman, supra; In re Callahan, supra.* Though such a review is in effect *de novo,* when a question of fact is at issue, it is encumbent upon each party to present facts relevant to the issue with appropriate references to the record. This is the process which will be employed when considering the sufficiency issues now raised.

This Court has examined all matters submitted herein, including the Respondent's brief, the transcript and the exhibits. We find generally that the Respondent was admitted to the Bar of the State on March 20, 1970. On October 24, 1983, this Court, upon a petition, hearing and recommendation by the Hearing Officer, entered an Order temporarily suspending the Respondent pending the final determination of this cause.

In Count I of the Complaint the Respondent is charged with obtaining, by deceptive means, the original of a non-sufficient funds check from a prosecution witness; and, further, with making false statements under oath while testifying concerning the same matter. Relative to this Count, we find that the Respondent represented Kim Blake in a series of "bad check" cases for which she was being prosecuted in Delaware County, Indiana. One such case involved a check with which Kim Blake had made a purchase at a K-Mart store in Muncie, Indiana. The check was returned for non-sufficient funds, and an information was filed on February 2, 1981. On June 24, 1981, at a pre-trial conference, an agreement was reached between the Respondent and David Whisler, Delaware County Deputy Prosecuting Attorney, whereby Kim Blake would plead guilty to certain charges, pay a fine and perform four days community service in lieu of a jail sentence. The agreement was conditional upon her making restitution on all the bad checks before September 9, 1981, the date of the scheduled dispositional hearing.

The defendant failed to appear on September 9, 1981, as scheduled. On defendant's motions, the case was rescheduled twice, for September 23 and for October 7, 1981. On October 7, 1981, the defendant appeared late; she had not made restitution on any of the checks. During a heated conversation between the Respondent and Whisler, the latter informed the Respondent that, because of Blake's failure to make restitution, he would no longer abide by the plea agreement; he set all matters for trial on November 3, 1981. In a conversation later that day, Whisler did advise Carmany that the only way to reinstate any type of plea negotiation was if Blake made restitution on all the checks and the Respondent notified Whisler of that fact at least seven to ten days prior to trial.

In Delaware County, the prosecutor's policy in "bad check" cases required the prosecuting witness to retain the checks and only give a receipt for the restitution. Restitution had to be made before there could be a plea agreement, mainly as an enforcement tool. The K-Mart store followed the same policy. The Respondent practiced in Madison County where the accepted practice in this sort of case was for the Defendant to pay and "pick up" the

bad checks prior to any plea agreement or trial on such matters. The Respondent was unaware of the Delaware County policy.

On October 7, 1981, shortly after leaving Whisler, the Respondent went to the K-Mart store. There he spoke with Linda Alexander, an employee, while another employee was nearby. The Respondent related to Alexander that he represented Kim Blake, that he wished to pay the bad check in question, and that it was necessary for K-Mart to release the check in return. He stated further that he had just come from the Courthouse where he had spoken with the Prosecutor. After consulting with her supervisor, Alexander accepted payment and turned the check over to the Respondent. At no time did she challenge his request for the check, nor did she suggest or advise that he could only have a receipt for the restitution. However, Alexander's distinct understanding from listening to the Respondent was that the Blake case was in the final stages of disposition. The Commission contends, without making any supporting citations to the record, that the Respondent falsely stated to Alexander that the charges against Blake had already been dismissed. The Respondent cites to contradictory testimony. ·

It is clear that the Respondent, without being advised otherwise, proceeded in this matter in accordance with a policy which was prevalent in his own county of practice. Restitution on the check would have been a necessary prerequisite under each policy. This evidence cannot support a conclusion that the Respondent's actions were motivated by an intent to deceitfully obtain evidence. However, the Respondent was fully aware that he had no agreement with the Prosecutor and that any restitution was being done in the hope of reinstating the original agreement. To the extent that he misrepresented the status of plea negotiations and the mere possibility of an agreement, and thus misled Alexander, he engaged in misconduct.

Under this Count, we find further that thereafter Linda Alexander received a subpoena to appear for trial on November 3, 1981, as a witness in the Blake case. She advised the Prosecutor that she no longer had the check because she had given it to the Respondent when he had made restitution and had given her the impression that the charges had been dismissed. Whisler had a photocopy of the check.

On November 3, 1981, Kim Blake again failed to appear, but the Respondent was present. At that time restitution had been made on some but not all of the checks. Prior to calling the case, Whisler related the matter to the Judge of Delaware County Court I, who instructed Whisler to hold a hearing to determine if there would be any objection to a photocopy of the check being introduced, and, if there was, to determine the whereabouts of the check. In the course of the proceeding, the Respondent did make an objection but also stipulated that he had the original check. The Respondent, while testifying on November 3, 1981, as to his obtaining the check, stated that he had never suggested to anyone that the charges against Blake were dismissed and that he had made a tentative agreement in the case with a former prosecutor. In fact, the only agreement in the case had been called off by Whisler and had not been reinstated by the Respondent within 7 days prior to the trial because full restitution had not been made; nor had there been any other prosecutor involved in this case. These findings are more than sufficient under the "clear and convincing evidence" standard to support a conclusion that the Respondent gave false testimony under oath. We, therefore, conclude that he did violate Disciplinary Rule 1–102(A)(4), (5) and (6) of the *Code of Professional Responsibility for Attorneys of Law.*

Under Count II, the Respondent again challenges the findings and conclusions, and, in support of his contentions, cites to the record. The Commission makes no references to contradicting evidence. We find that in early April, 1981, the Respondent was in a camera shop owned by Richard and Miriam Handly in Muncie, Indiana, where he was buying a lense for his cam-

era. He had purchased camera equipment from them for a period of several years. In the course of the conversation with Richard Handly, the existence of the "Executive Investment Club Money Pyramid" and the Respondent's involvement therein came up. Richard Handly expressed an interest and asked the Respondent to bring more information. They arranged a luncheon meeting for that purpose. Prior to the next meeting Richard Handly had contact with an acquaintance, Treva Paggett, who was involved in the Anderson Money Club. She advised Handly that, from her standpoint, the club was successful.

Within a week, the Respondent met with the Handlys at a luncheon meeting and gave them a detailed explanation of the "money pyramid". During this meeting, the Respondent made representations that the "money pyramid" was a successful venture in Anderson, Indiana; that the purpose of the club was to set up a "chain letter" without the use of the mails; that the Handlys would become members of the club by buying a "letter" for $1,000. When a purchaser bought a letter his name would go on the bottom of a six-name list; $500 would go to the name on the top of the list and the person selling the letter would retain $500; as more letters were sold, the original "investment" would be totally recouped and one's name would move up to the top where one begins to profit. The Respondent further represented to the Handlys that one could improve his position in the chain letter by purchasing more letters "from themselves" and thereby "buying their way up the ladder". He also represented that he had a list of buyers interested in purchasing the letters and that he could sell the letters for the Handlys with no difficulty. He would not charge the Handlys for his participation, but he would split any profit made on a 50% basis. The Respondent also cited to a statement by the Hamilton County Prosecutor that the venture was found to be legal. The Respondent's representation was based on an article printed in the *Noblesville Daily Ledger* which attributed the opinion of legality to said prosecutor.

Thereafter, the Respondent gave the Handlys a packet of documents containing this article.

At the time in question, the Respondent knew that he had never received any opinion of legality and that his representation was based solely upon the article in question. The Respondent did not assure the Handlys that the investment was risk free nor did he give a personal guarantee that they would receive all or part of their investment back. The Handlys were aware of these facts and decided to invest in the venture with intent to sell their "letters" in the Muncie area thereby starting a branch of the Club in Muncie.

Within two days of their luncheon meeting, the Handlys gave the Respondent $4,000 for which he gave a receipt. He distributed the money to the proper members of the Anderson Club.

The Respondent agreed to assist the Handlys in selling their letters, and, in an effort to do so, he set up a series of three "meetings" in a period of one month after the payment. At these meetings the only participants to attend were Richard and/or Miriam Handly, the Respondent, his close personal associates, the owner of the building at which two of the "meetings" were held, and one person brought by Mr. Handly. Neither the Handlys nor the Respondent were successful in selling the Handly letters.

After several months, Miriam Handly contacted the Respondent on several occasions. She was upset about the lack of sales of the letters. On these occasions, the Respondent advised her that he had sold the letters and that he had money for the Handlys; that he would deliver money to them; that he would attempt to sell the letters and remove their name from the list.

The Handlys themselves lost interest in the venture and made no effort to solicit buyers. Mrs. Handly, in particular, looked to the Respondent for the return of the $4000 and made repeated threats that she would do anything necessary to force the

Respondent into paying her $4000. On March 6, 1982, almost one year after the initial purchase of the letters, the Respondent gave Miriam Handly $500 which he had received from the sale of one of the Handly letters. Miriam Handly had prepared a receipt for said money which also stated that the balance due to the Handlys was $3,500. The receipt was signed by the Respondent and by Miriam Handly. The Handlys received no other money from the Respondent, and, by January, 1983, the "Executive Investment Club Money Pyramid" had "collapsed."

The Respondent contends that the evidence is insufficient to support a conclusion that he misrepresented the legality of the "Money Club" because there is no evidence that it has been held to be illegal or that any prosecutions have ensued. This argument is unpersuasive. By citing to an opinion given by a prosecutor, while knowing that he himself had not sought nor received such an opinion, the Respondent clothed the venture with an aura of official sanction which did not in fact exist. Whether or not the venture is legal or illegal is not an issue to be tried in this proceeding.

The Respondent further contends that he did not promise to sell the Handly letters but only offered to help the Handlys start a Muncie Money Club. We do not agree. The Respondent's representations did not make him a guarantor; however, his representations as to availability of willing buyers, his knowing such people, and the ease with which such letters could be sold were false and misleading.

The Respondent also contends that he was pressured into signing the "balance due" statement; that his action was an error in judgment; and that his doing so in no way guaranteed repayment. This is not the proper proceeding for determining whether this "balance due" statement obligates the Respondent to repay the Handlys. The Respondent, however, did, on several occasions, make statements to Miriam Handly that he had sold the letters, that he had money for her and that he would deliver money to her, when, in fact, none of this

was true. By making such statements, the Respondent engaged in conduct involving misrepresentation and conduct which adversely reflects on his fitness to practice law.

We find that the foregoing findings are more than sufficient under our present standard to prove that the Respondent's conduct is in violation of D.R. 1–102(A)(4) of the *Code of Professional Responsibility.*

The findings of fact under Count III are not in dispute. In August, 1982, Annice Marshall retained the Respondent to represent her in a personal injury action arising out of a bicycle-vehicular accident involving Marshall and an employee of the McGuff Supply Company (McGuff). The Respondent agreed to be paid on a contingency fee basis.

The Respondent entered into settlement negotiations with McGuff's insurer, Employees Insurance of Wausau and, in or around January, 1983, a settlement was reached whereby Marshall was to receive $21,000. On January 25, 1983, Employees Insurance of Wausau issued a draft for the amount of $21,000, payable to David O. Carmany and Annice Marshall. On the same date, the draft was delivered to the Respondent and endorsed by Marshall and the Respondent.

On January 26, 1983, the above-mentioned draft was deposited into the Respondent's personal bank account at the Anderson Banking Company. The account balance after the deposit was made was $21,065.51. The Respondent had an attorney's escrow account at a different banking institution but he deposited the money in his own account in the Anderson Banking Company because his client assured him that she needed the money as soon as possible.

On January 27, 1983, the Respondent issued a check on the same personal account, payable to David Arnold, in the amount of $2,300 and a check payable to "Cash" in the amount of $17,500. The latter check was endorsed by the Respondent, and he took possession of the cash.

The payment to David Arnold was in satisfaction of Respondent's personal obligation to Arnold. After the "cash" withdrawal, the balance remaining in the account was $2,615.51. On January 31, 1981, the balance became $312.51.

In February of 1983, Annice Marshall contacted the Respondent on several occasions. On each occasion, the Respondent misrepresented to Marshall that her funds were still in the bank account and would be paid to her in the near future. On March 23, 1983, Marshall had not received any of the settlement funds when she filed a request for investigation. No funds were payed to Marshall until late June and early July, 1983, when the Respondent turned over to her $14,000.

The Respondent's explanation for the foregoing is that the Internal Revenue Service had inquired about his assets in the Anderson Banking Company. The reason for this eventual freezing of the Respondent's account was a misunderstanding which has since been resolved. However, on January 26, 1983, the Respondent received a call from his step-father advising him that someone was attempting to get a court order to seize Respondent's assets in the Anderson Banking Company. This call prompted the Respondent to withdraw the money.

The Respondent, on January 26, 27, and 28, of 1983 made attempts to contact Marshall so that her funds could be delivered to her. On Friday, January 28, 1983, he and an Anderson police officer, Jack Vaughn, set out for Chicago, Illinois, to pick up a friend of the Respondent. The Respondent has testified that, in order to protect Marshall's funds from his estranged wife, who had access to his office safe, he took the money with him on the trip to Chicago. The Respondent and Officer Vaughn were traveling in a blue and white Buick belonging to David Arnold. The Respondent was in the process of purchasing the car from Arnold and had permission to use it.

At Merrillville, Indiana, the travelers decided to stop for dinner at a McDonald's Restaurant. During the time they were inside the restaurant getting their food, the car was stolen. The theft was reported from the phone of a neighboring restaurant. The Merrillville police arrived on the scene shortly after being called and located the car in 10 minutes. It was abandoned within 2 miles of the theft. When it was found the car was unoccupied, the driver's side was open, the window was smashed out and the trunk was open. The driver's side window had been broken from the outside. The Merrillville police detective recovering the vehicle observed a revolver stuck between the seat and floor and a C.B. radio with a cassette player, all intact. The police unloaded the gun without Respondent's knowledge. The trunk of the car could be opened by pushing a button inside the glove compartment; there was no damage to the ignition nor the trunk lock. The detective ascertained that the Respondent had the ignition key, which would not work in any of the unopened car doors, and verified that the other key was with David Arnold, in Muncie. Because of these findings, the accident was classified as criminal mischief rather than vehicle theft.

Upon discovering the theft of the vehicle, the Respondent became hysterical because of the money he had placed in a brief case inside the trunk. When the car was found by the Merrillville Police Department, there was no briefcase with money in the trunk. The Respondent never reported the money or briefcase as stolen nor did he tell Marshall that the money was taken. Officer Vaughn did not understand why the Respondent was upset because Vaughn was unaware of the contents of the trunk.

After the incident, the Respondent and Vaughn headed back to Anderson because the Respondent was too upset to continue the trip to Chicago. Initially, the Respondent was driving. However, due to his semi-hysterical state he was unable to properly operate the vehicle, and Vaughn took the wheel. During the trip the Respondent repeatedly stated that he "was dead" and that he "couldn't go back". The Respondent picked up his gun, placed the

barrel to his head, and pulled the trigger. Officer Vaughn then took the gun and kept it in his possession.

After considering the foregoing findings, including the Respondent's explanation, the fact remains that the Respondent did fail to preserve the identity of Marshall's funds in a separate account; he failed to notify her that he had withdrawn the cash; he failed to maintain proper records; and after taking the money without her permission, did not pay the same over to her as requested. This evidence is more than sufficient to prove that the Respondent violated Disciplinary Rule 9–102(A) and (B). Furthermore, the Respondent's numerous misrepresentations to Marshall as to the location of her money and his providing false information for a police report constitute misconduct and are in violation of Disciplinary Rule 1–102(A)(4), (5) and (6).

■ The Respondent is also charged with engaging in illegal conduct involving moral turpitude in violation of Disciplinary Rule 1–102(A)(3). In that the Commission has not cited any criminal statute under which this Court can evaluate the Respondent's conduct as to illegality, we find the charge insufficient.

■ Having examined the foregoing findings, we conclude that the Respondent engaged in misconduct under all three counts. It now becomes this Court's duty to assess the appropriate discipline. In making such a determination, this Court takes into account the specific acts of misconduct, this Court's responsibility to preserve the integrity of the Bar, and the risk, if any, to which we will subject the public by permitting the Respondent to continue in the profession or be reinstated at some future date. *In re Welke*, (1984) Ind., 459 N.E.2d 725; *In re Callahan, supra; In re Vincent*, (1978) 268 Ind. 101, 374 N.E.2d 40.

The Respondent insists that he suffers from a mental condition which should serve as a mitigating circumstance to lessen his culpability and, therefore, lessen the severity of discipline imposed.

We find relative to this issue that the Respondent underwent two psychological testing sessions, on December 6, 1982 and July 6, 1983 and met twice with a psychiatrist. As a result, he has been diagnosed as having manic depression in the manic stage, active psychosis, schizophrenia and possible paranoia. This condition was more acute during the period of the first testing; the second testing showed some improvement and a chronic, long-standing disorder. There was testimony that the disorder could be dealt with fairly adequately with medication. During the period of time in question, the Respondent was also undergoing marital, financial and personal problems which involved substance abuse and excommunication from the church. Other than the psychological evaluation sessions, there is no evidence that the Respondent is actually undergoing any specific treatment for his mental condition.

In his brief, the Respondent cites to instances in this and other jurisdictions where evidence of mental illness or other disease, such as alcoholism, has served as a mitigating factor. As we have stated earlier, evidence of mitigation may be considered and is an element in this Court's evaluation.

■ In making our determination, this Court is not unmindful of these unfortunate circumstances which are, undoubtedly, intertwined with the Respondent's law practice. Against these findings we must weigh our duty to maintain a competent Bar and protect the public from further unethical conduct. Respondent's specific acts of misconduct, taking his client's funds under the most bizzare circumstances, without any authority and in flagrant violation of the rules, and his engaging in deception and misrepresentation strike at the very core of the attorney's basic obligation to his client, trust. Furthermore, there is no evidence to convince this Court that the Respondent's problems have been solved and further incidents of misconduct will not occur. This Court must safeguard the public from unfit attorneys, whatever the cause of unfitness may be. *In re Vin-*

*cent, supra; In re Connor* (1976), 265 Ind. 610, 358 N.E.2d 120. We cannot allow such violative conduct to tarnish the integrity of the Indiana Bar nor will we permit the slightest possibility of subjecting the public to such risks. *In re Vincent, supra.*

In light of the foregoing considerations and the extreme seriousness of the unethical conduct involved in this case, we find that removal from the practice of law is warranted. It is, therefore, ordered that, by reason of the misconduct found herein, the Respondent be, and he hereby is, disbarred from the practice of law in this State.

Costs of this proceeding are assessed against the Respondent.